UNITED STATES of America, Plaintiff–Appellee,

v.

Steven C. GRIFFIN, Marvin M. Rux, and Andrae Scurlock, Defendants– Appellants.

Nos. 94–3030, 94–3340 and 95–1564.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1995.

Decided May 22, 1996.*

Rehearing En Banc Denied July 30, 1996.

---

* This appeal originally comprised four consolidated appeals, one of which (No. 94–3846) was from an order finding counsel for Marvin Rux in contempt. We have bifurcated our resolution of this appeal and address the order of contempt in a separate decision.

914

Patrick M. Collins (argued), Office of the U.S. Atty., Crim. Div., Chicago, IL, Barry Rand Elden, Chief of Appeals, Office of the U.S. Atty., Crim. Appellate Div., Chicago, IL, for the U.S.

Joseph R. Lopez (argued), Chicago, IL, for Steven C. Griffin.

Gerardo S. Gutierrez (argued), Chicago, IL, for Marvin M. Rux.

Scott J. Frankel (argued), Frankel & Cohen, Chicago, IL, for Defendant-Appellant.

** Hon. Walter Jay Skinner, U.S. District Judge for the District of Massachusetts, sitting by designa-

Before KANNE and DIANE P. WOOD, Circuit Judges, and SKINNER, District Judge.**

KANNE, Circuit Judge.

A federal jury in Chicago convicted Steven Griffin, Marvin Rux, and Andrae Scurlock of various offenses alleged in a twenty-three count indictment, including conspiracy to possess cocaine with intent to distribute, money laundering, and structuring financial transactions. Griffin and Rux appeal from their convictions alleging procedural errors and a lack of evidence sufficient to support their convictions under certain counts of the indictment. Scurlock appeals from the district court's denial of his motion for a new trial under FED.R.CRIM. P. 33. The appellants' arguments are unavailing, and we accordingly affirm the convictions.

I

A grand jury handed down a third superseding indictment on April 27, 1993, which alleged twenty-three counts of unlawful conduct and one count of criminal forfeiture. Count one charged Griffin and Scurlock with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 and charged Rux with aiding and abetting that conspiracy in violation of 18 U.S.C. § 2. Count two charged Griffin with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Counts three and twenty-three charged Griffin with laundering the proceeds of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and count twenty two charged Griffin with engaging in transactions using proceeds of a specified unlawful activity in violation of 18 U.S.C. §§ 1957(a), 1961(1). Counts four through twenty-one charged both Griffin and Rux with laundering the proceeds of a specified unlawful activity in violation of § 1956(a)(1)(B)(i) and (ii) and/or with structuring financial transactions so as to evade the currency transaction reporting requirements of 31 U.S.C. § 5313 in violation of 31 U.S.C. §§ 5322(a), 5324. The final, unnum-

tion.

bered count alleged the basis for criminal forfeiture under 21 U.S.C. § 853(a) of several parcels of real property and two automobiles, all of which were owned by Griffin.

Prior to the date of the third superseding indictment, Griffin and his then-attorney entered into plea negotiations with the government. In the course of these negotiations, Griffin signed a proffer letter on September 22, 1992, which outlined the terms and conditions of his agreement with the government, and signed an ensuing plea agreement on September 24 in which he agreed to plead guilty to count one of the second superseding indictment and admitted to the allegations contained in counts one through twenty-three. Griffin subsequently had a change of heart and a change of counsel, and the district court granted the government's motion to revoke the plea agreement. Following the revocation of the plea agreement, the grand jury issued the third superseding indictment, and the case headed to trial.

The evidence presented at trial focused upon Griffin's and Scurlock's collaborative efforts to distribute cocaine and to launder the profits of that business with the aid and assistance of Rux. The government presented testimony from, among others, several cooperating witnesses involved in the conspiracy, namely, Dwayne Hemphill, Gregory Hawkins, and Terence Ferguson;[1] Scurlock's girlfriend, Joy Sanchez; and Rodney Rhodes, one of Scurlock's retail cocaine buyers. Their testimony, combined with the other evidence presented by the government, painted a picture of an expanding and lucrative cocaine distribution business that laundered its cash profits through various devices in an attempt to conceal the source of its income and to legitimize that income.[2]

Griffin began his foray into the cocaine trade as a retail distributor supplied by Scurlock. Hemphill testified that he began working for Griffin on a part-time basis in 1985 delivering relatively small amounts of cocaine to Griffin's customers out of Griffin's hair salon at 79th Street on the south side of Chicago. The business steadily expanded from 1985 through 1988 and began to move wholesale (i.e., kilogram) quantities of cocaine. In light of this increasing traffic and the attendant profit opportunity, Hemphill became Griffin's full-time assistant in 1987, planning the movement and storage of the product and personally conducting the transactions with Scurlock.

Two government witnesses testified that Scurlock was actively involved in distributing cocaine. Joy Sanchez, Scurlock's longtime girlfriend, testified that Scurlock had been involved in cocaine distribution since the early 1980s and that he regularly weighed and packaged cocaine both at his apartment and at the coach house at 4530 South Ellis in Chicago, where he moved in 1985. Sanchez stated that she had asked Scurlock to stop selling cocaine and that he had threatened her with physical harm should she contact the law enforcement authorities. Rodney Rhodes testified that he and another person purchased one quarter kilogram of cocaine from Scurlock at a "three or four flat" apartment on Chicago's south side in March 1989.

In the spring of 1988, Griffin initiated a business relationship with Mario Lloyd, who would supply Griffin with at least thirty kilograms of cocaine in four separate transactions that year. Griffin terminated his dealings with Lloyd in late 1988 after Lloyd's assistant, Troy Shelton, was arrested in possession of twenty-four kilograms of cocaine. Following Shelton's arrest, Griffin relied on

---

1. Dwayne Hemphill and Terence Ferguson entered into plea agreements with the government after being named as coconspirators in earlier indictments. Gregory Hawkins entered into a plea agreement based upon his distribution of cocaine on behalf of Mario Lloyd, who had at one time supplied Griffin with cocaine. Other cooperating witnesses testified under grants of use immunity.

2. In assembling the facts in this appeal, we have noted discrepancies between the trial record and

the government's recitation of facts in its brief to this court. Some of the government's statements are not supported, and in some cases are directly contradicted, by the portions of the record cited by the government. For example, compare Government Brief at page 19, lines 12–14, with Trial Transcript, pages 1703–16. This is not a situation we would expect to recur. Statements of facts must be accurate renditions of the evidence as supported by the record. See 7TH CIR. R. 28(d).

Scurlock as his primary source for a steadily increasing volume of product.

As the volume of cocaine increased, the conspiracy suffered some growing pains, including the arrests of several subordinates and the firings of others (including Hemphill). However, the evidence suggests that these events were only speed bumps for the Griffin–Scurlock partnership that continued into 1989. The two principals enjoyed the fruits of their relationship by spending large sums on automobiles, clothing, and accessories—"living the good life," as the government puts it. The business was generating large sums of cash, and Griffin and Scurlock decided to employ the services of Rux, a licensed attorney with an office at 97th and Western streets on Chicago's southwest side.

The evidence at trial shows that Rux primarily involved himself in real estate transactions and employed Terence Ferguson as an assistant. In late 1987, Rux and Ferguson formed Real Estate Investment Systems ("REIS") for the purpose of buying financially distressed properties and spinning them out of foreclosure at a profit. Rux wanted to solicit investors with large volumes of cash in need of laundering, and Ferguson testified that Rux viewed cocaine merchants as the ideal clients for his investment scheme. Rux had met Scurlock in late 1987 and Griffin some time later, and he subsequently directed Ferguson to assist Griffin as he began his business relationship with Rux and REIS.

Ferguson testified about the details of Rux's and Griffin's laundering and structuring activities, which included the Griffin-financed purchases of real property by REIS. In response to Rux's solicitation, Griffin made several investments in REIS totaling approximately $39,000 in exchange for a fixed 210% annualized interest rate over a sixty-day period. REIS used the money to purchase financially distressed real properties, and it then recruited nominal buyers to purchase the properties. These buyers would put mortgages on the properties and use the proceeds to pay off the REIS invest-

ments, which bore the usurious interest. While the return was nothing to sneeze at, Griffin had a more urgent motivation—the detergent effect REIS had upon his ill-gotten gains. REIS rinsed Griffin's principal and then paid him the principal and interest by check, which he could deposit in a bank account as purportedly legitimate income without triggering a currency transaction report under 31 U.S.C. § 5313. The evidence at trial demonstrates that Griffin did not have a legitimate source of income to account for his investment in REIS, particularly in light of his immersion in "the good life."

Ferguson also recounted the details of Griffin's purchases in late 1988 of a convenience store in Calumet Park, a house in Country Club Hills, and a six-unit apartment building in Chicago. Prior to each transaction, Rux directed Ferguson to convert Griffin's cash, which Griffin usually left in Ferguson's office, into several cashier's checks, each for less than $10,000, and to use the cashier's checks for the downpayments. The evidence showed that Ferguson converted a total of $99,810 into sixteen cashier's checks at Rux's and Griffin's behest, all in amounts under the $10,000 threshold of 31 U.S.C. § 5313.

The jury convicted Griffin, Rux, and Scurlock on all counts of the third superseding indictment on February 24, 1994. Griffin and Rux filed motions for judgments of acquittal or alternatively for new trials under FED.R.CRIM. P. 29 and 33, respectively, which the district court denied. The district court entered judgment of conviction against Griffin on August 22, 1994,[3] and against Rux on October 4, 1994. Scurlock filed a motion for new trial under FED.R.CRIM. P. 33 on August 26, 1994, based upon the allegedly false trial testimony of Joy Sanchez and Rodney Rhodes. The district court denied Scurlock's Rule 33 motion and entered judgment of conviction against him on February 27, 1995.

All three defendants filed timely notices of appeal. Griffin raises two procedural chal-

---

**3.** Griffin waived his right to have the jury adjudicate the forfeiture count of the indictment. Upon the government's motion under 21 U.S.C. § 853(a)(1) and (2), the district court entered a preliminary order of forfeiture on August 31 regarding certain real and personal property owned by Griffin.

lenges to his conviction and claims there was insufficient evidence to support his conviction for money laundering. Rux likewise claims insufficient evidence with respect to both the money laundering and aiding and abetting convictions. Scurlock's appeal focuses solely upon the district court's denial of his motion for a new trial.

## II

### A

■ A defendant's statements made during a plea colloquy or pursuant to a plea or proffer agreement are generally inadmissible against him at trial pursuant to FED.R.CRIM. P. 11(e)(6):[4]

> Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> (A) a plea of guilty which was later withdrawn;
>
> (B) a plea of nolo contendere;
>
> (C) any statement made in the course of any proceedings under this rule regarding either of the foregoing pleas; or
>
> (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Many, if not all, plea or proffer agreements contain a provision allowing for the use during trial of the defendant's proffer statements should he in some fashion offer evidence inconsistent with those statements. As with any contract, the language of the proffer binds the parties. Where, for example, the proffer letter allows for impeachment should the defendant inconsistently testify, the statements are admissible for that purpose. *United States v. Goodapple*, 958 F.2d 1402, 1409 (7th Cir.1992). We have also held that terms of a proffer letter allowed the government to introduce a defendant's proffer statements to impeach a defense witness who provided testimony inconsistent with the proffer. *United States v. Dortch*, 5 F.3d 1056, 1065–66 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).[5]

■ Our analysis in those cases highlights the importance of the language used in the proffer letter or agreement. For instance, the agreement signed by the defendant in *Dortch* disclaimed any limitation upon the government's use of the statements except during its case-in-chief. *Id.* at 1067 n. 9. More importantly, however, the agreement allowed for the use of the proffer statements "to rebut evidence or arguments materially different from any statements made or other information provided by [the defendant]." *Id.* The expansive scope of the agreement in *Dortch* is perhaps rivaled by the terms of Griffin's agreement with the government. It reads, in part:

> [I]f your client should subsequently testify contrary to the substance of the proffer or otherwise present a position inconsistent with the proffer, nothing shall prevent the government from using the substance of the proffer at sentencing for any purpose, at trial for impeachment or in rebuttal testimony, or in a prosecution for perjury.

It was the "otherwise present a position inconsistent with the proffer" language that incited the controversy at trial.

Griffin claims that the contemplated use of the admissions he made in connection with his proffer agreement impaired his sixth amendment right to cross-examine the government's witnesses. He classifies certain

---

**4.** Rule 11(e)(6) goes on to list two exceptions to the principle of inadmissibility, neither of which are relevant to this appeal.

**5.** We note an important distinction between *Dortch* and the present appeal. The defendant in *Dortch* challenged the admission of his statements under the Fifth Amendment to the United States Constitution, which provides, among other things, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Griffin asserts that the admission of his statements offended the Sixth Amendment's guarantee that he "be confronted with the witnesses against him." U.S. CONST. amend. VI. We rely on *Dortch* only by analogy to the linguistic analysis of the waiver as discussed below.

comments by the district court as "rulings" on the admissibility of proffer statements to rebut evidence adduced on·cross-examination by his trial counsel, Joseph R. Lopez.

We disagree with Griffin's version of events. The proffer statements made by Griffin were never offered or admitted into evidence, and no ruling or order of the district court on this issue is amenable to appellate review.

Following Mr. Lopez's cross-examination of two government witnesses, the government raised with the court the issue of the inconsistencies between Griffin's admissions in his proffer sessions and the position that Mr. Lopez had presented during his opening statement and attempted to present. during his cross-examinations.

Mr. Lopez questioned the validity of Griffin's waiver of his rights under FED.R.CRIM. P. 11(e)(6) by virtue of the proffer letter and argued that any such waiver did not encompass Griffin's sixth amendment right to cross-examine government witnesses. Mr. Lopez also stated that the proffer letter did not contemplate the use of Griffin's admissions to rebut his cross-examination. The district court replied that Mr. Lopez was using cross-examination "as a vehicle for putting before the jury Griffin's defense" and that his questioning went beyond "simple confrontation of the witness."[6] The court stated that, in effect, counsel for Griffin was attempting to put on part of Griffin's case-in-chief during the government's case.

THE COURT: Given the light of this proffer letter, it's virtually impossible for Mr. Griffin practically to take the witness stand. But it seems to me that if the rule is that you—the proffer gets opened up because you present a position inconsistent with the proffer, I think you've done that.

And the proffer letter does not limit it as I read the proffer letter to offering of your own witnesses. It simply says present a position....

But I think the cross-examination of Foster is simply the clearest example of your using a government witness as your witness with the advantage of being able to do that by cross-examination rather than direct. So I don't think it's mere cross-examination, and I don't think it's mere confrontation....

The government then indicated its intent to use the proffer if Mr. Lopez persisted on this course of questioning. Mr. Lopez announced that the government was using the proffer as the "sword of Damocles" to restrict his cross-examination and therefore undermining his ability to represent Griffin.

The district court conducted a hearing to assess the validity of Griffin's waiver of FED. R.CRIM. P. 11(e)(6). Both Griffin and his former counsel testified at the hearing, and the record demonstrates that both men recognized the ambiguity of the "position inconsistent" language in the proffer letter. The district court found that Griffin was aware at the time he signed the proffer letter of the uncertain meaning of "present a position inconsistent with this proffer" and that he knew of the risk that his statements could be used against him in a then unforeseen fashion.

Having determined that Griffin's waiver of the use of his proffer was valid, the district court discussed with counsel how the potential admissibility of any proffer statements would be resolved:

> flirting with the consequences of Griffin's proffer agreement, it drew a distinction between the confrontation contemplated by the Sixth Amendment and the extent of Mr. Lopez's cross-examination. The district court was concerned with the proffer's admissibility only with regard to those questions that could be classified as beyond confrontation. The district court was not assuming a sixth amendment waiver by Griffin because it viewed the questions/conclusions posited by Mr. Lopez during cross-examination as potentially without the ambit of the confrontation clause.

6. Griffin concludes in a footnote to his brief that the district court's characterization of Mr. Lopez's cross-examination manifests its conclusion that Griffin had "knowingly waived his constitutional rights." There are two responses to this bald assertion. First, such conclusory statements are unpersuasive for their paucity of analysis. Second, the district court's view of Mr. Lopez's cross-examination did not amount to a ruling that Griffin had waived any of his constitutional rights. Quite the opposite. When the district court suggested that Mr. Lopez was exceeding the bounds of cross-examination and

THE COURT: So the government is entitled in my view to use the proffer material, and I state that as a general principle. The reason I'm stating it as a general principle is because since the government has taken the position that they do not intend to use the proffer material on the present state of the record and I'm dealing only with that which looks forward and not that which looks to the past, I intend, if this is a matter of concern to Mr. Lopez or his client, to hold a hearing before the presentation of the defense case at which time Mr. Lopez will tell me on the record precisely of what the defense case will consist.

In other words, you will make an offer of proof, the government will then tell me whether they believe that any of that offer of proof is inconsistent with the proffer, and if so what portions of the proffer they intend to introduce, and I will then rule on the question of its admissibility in light of, one, its actual inconsistency, and, two, in light of its admissibility under [FED.R.EVID.] 403, because we may be faced with a situation in which the prejudice substantially outweighs whatever relevancy there is.

So basically until we have an offer of proof from Mr. Lopez, we don't have to go any further. We're past the point of general principles and we are now down to the specifics.

So basically you're going to have to tell me what it is, Mr. Lopez, that you want to put in, and I will tell you whether under 403 or the proffer itself what you want to put in is inconsistent. And I do believe that at least with respect to some of the things that have gone in, you have an argument that maybe the proffer is not inconsistent. So we will deal with that as time goes on.

MR. LOPEZ: Just one other thing, so it's clear on the record. I understand from your ruling that I should also narrow my cross-examination in light of the fact that the proffer could be used if something is opened up during cross-examination.

THE COURT: No. I'm not asking you to narrow your cross-examination. What I'm asking you to do is, if you feel that somehow your cross-examination might open a door, to ask for a side bar, tell me what subjects you intend to cover, and we'll deal with whether it opens the door, and we will also deal with the question of whether it's appropriate cross-examination at all, because if, for example, it is objectionable on other grounds, we don't have to face the—

MR. LOPEZ: That's fine, Judge. That's what I request. Thank you.

The district court thus provided explicit guidance to enable Griffin to obtain preliminary rulings on whether specific questions on cross-examination would permit proffer statements to be used against him. Mr. Lopez asked the court if he should narrow his cross-examination of the government witnesses, and the court explicitly said, "No." Then the court stated: "What I'm asking you to do is, if you feel that somehow your cross-examination might open a door, to ask for a side bar, tell me what subjects you intend to cover, and we'll deal with whether it opens the door . . . ."

Griffin did not follow the court's directions. He made no offers of proof relating to questions he might have asked witnesses during cross-examination. At no time during the balance of the trial did the district court have an opportunity to make a ruling on the admissibility of Griffin's proffer statements.

It was not until after the conclusion of the submission of evidence and all parties had rested that Mr. Lopez made what he described as "an offer of proof" regarding four areas in which he would have cross-examined Rux when Rux took the stand in his own defense. With one exception pertaining to the existence of an attorney-client relationship between Rux and Griffin based upon the frequency of their meetings, the government stated that those questions were designed to elicit information contradictory to Griffin's admissions pursuant to the proffer letter. The district court agreed, stating: "Yes, I think so too. And the daily basis [i.e., attorney-client privilege] question, you, I think, could have been asked and I don't think anything in my rulings prevented you from asking and I think it's not particularly significant."

This "offer of proof" was too late. The district court had spelled out for Mr. Lopez the means by which he could explore the risk of the admission of the proffer prior to his questioning any witness on cross-examination. He did not use the procedure established by the court and declined to make an offer of proof during the evidentiary phase of the trial, which would have put at issue the admissibility of the proffer.

The bottom line is that the district court was not presented with an opportunity to make a ruling concerning the admission of any proffer statements. Without a ruling that a specific proffer statement would be admissible, there can be nothing to appeal.

### B

■ Earlier in the colloquy set forth above, the district court also established the framework for resolving the admissibility of proffer statements in Griffin's case-in-chief. The court advised Griffin that it would "hold a hearing before the presentation of the defense case at which time Mr. Lopez will tell me on the record precisely of what the defense case will consist. In other words, you will make an offer of proof, the government will then tell me whether they believe that any offer of proof is inconsistent with the proffer, and if so what portions of the proffer they intend to introduce." The court went on to say that it would then rule on the question of admissibility in light of, one, any actual inconsistency, and two, in light of its admissibility guidelines of FED.R.EVID. 403.

Notwithstanding the direction given by the district court, Griffin made no offer of proof concerning questions in his case-in-chief which might implicate the use of the proffer by the government. Again, it was not until after the close of the evidence that Mr. Lopez (contemporaneous with his belated "offer of proof") summarized his view of the perceived restrictions under which he operated throughout the trial:

> I also wanted the record to reflect, too, that it was my position also, and I think everybody—I think the prosecution will agree, that I really couldn't present any character witnesses to testify to my client's lawful conduct during the period of time because in the proffer he made statements and admissions that he was selling drugs and therefore it was my belief that I had put the character witnesses on, Ms. Scott or Mr. Safer would have been able to confront them with statements made by Mr. Griffin.

THE COURT: I don't actually think that that's the case. I think that is not inconsistent. I mean that he has a generally lawabiding character, I don't know that it's necessarily inconsistent. And that offer, frankly, I think comes a little late.

In this excerpt, Mr. Lopez is discussing the character evidence he would have introduced during his case-in-chief—not the purported restrictions on cross-examination. Mr. Lopez's concerns about character witnesses implicate this court's decision in *Dortch,* where we held that a defendant's waiver of the protections of FED.R.CRIM. P. 11(e)(6) allowed the admission of his proffer statements to impeach a codefendant's contradictory testimony elicited by the defendant's counsel on direct examination. 5 F.3d at 1067–68. As we noted above, there are important distinctions between the issues raised in *Dortch* and those before us, but it is the similarities and not the distinctions between the two cases that are relevant to Griffin's challenge.

The language of Griffin's proffer agreement does differ from that of the agreement in *Dortch* but not in a way helpful to Griffin. The *Dortch* agreement prohibited the government from using the defendant's proffer statements only during its case-in-chief and explicitly disclaimed any other limitation. In addition, that agreement specifically allowed the government to use the proffer statements "to rebut evidence or arguments materially different" from the defendant's prior statements. *Id.* at 1067 n. 9. We held that these two provisions—particularly the latter one—allowed the government to use the proffer statements to rebut the codefendant's testimony. *Id.* at 1067–68.

The agreement in the present case contains language of similar effect. It provides that the proffer statements may be used "for impeachment or in rebuttal testimony" if Griffin either testified or "otherwise pres-

ent[ed] a position inconsistent with the proffer." The language "otherwise present" clearly means something other than Griffin's own testimony, and we wonder how a defendant would present a position, aside from his own testimony, other than through the questioning of witnesses or presentation of evidence. The agreement specifies rebuttal as a vehicle for admitting the proffer statements; this suggests a response to the defense's presentation in its case-in-chief and answers Mr. Lopez's concerns about his ability to present character witnesses.

As with his cross-examination, Griffin paid no heed to the district court's instructions. Griffin made no offer of proof that would have prompted the government to indicate whether it believed the offer of proof was inconsistent with the proffer. The district court was therefore never called upon to rule on the admissibility of any proffer statements. There is no appealable issue.

### III

Griffin and Rux appeal from the district court's instruction to the jury concerning the government's burden of proof under 31 U.S.C. § 5322(a). They claim that the jury instruction failed to adequately explain the statutory requirement of willfulness because it did not accord with the definition of willfulness in *Cheek v. United States,* 498 U.S. 192, 201–02, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991), and did not convey the precise scienter requirement identified in *Ratzlaf v. United States,* 510 U.S. 135, ——–——, 114 S.Ct. 655, 662–63, 126 L.Ed.2d 615 (1994).[7] We must first ascertain whether Griffin and Rux preserved objections to this instruction for appellate review.

### A

■ The record shows that Griffin approved the district court's decision to use the relevant instruction during the jury instruction conference. The court first addressed the government's proposed instructions but reserved judgment on instructions 53 and 53A, which the court viewed as designed to address "the change in Seventh Circuit law that was effected by the U.S. Supreme Court in *Ratzlaff* [sic]." After the defendants' objections had been identified, the following exchange occurred between the court, Assistant U.S. Attorney Scott, and Mr. Lopez:

> THE COURT: Okay, The agenda that we have now consists of government's instructions 28 through 31, government's instruction 37 and government's instruction 53 and 53A. Those are the ones to which there has been objection.
>
> * * *
>
> Let's talk a little bit about 53 and 53A. since that is new to all of us. These are the government's two proposed Ratzlaff [sic] instructions.
>
> MS. SCOTT: Instruction No. 53 is the one that Judge Aspen gave in United States v. Mario Lloyd with regard to the same charge, the basic willfulness instruction.
>
> THE COURT: In 53A?
>
> MS. SCOTT: 53.
>
> THE COURT: And 53A is?
>
> MS. SCOTT: 53A is just one that I proposed. It adds a little bit more to it, a little bit more expansive.
>
> THE COURT: My assumption is that defendants would prefer 53A.
>
> MR. LOPEZ: Yes.
>
> MS. SCOTT: No problem, Judge.
>
> THE COURT: 53A will be given.
>
> MS. SCOTT: We withdraw 53.

Griffin's counsel agreed that he would prefer instruction 53A. The district court's statements suggest that an objection had been made to instruction 53A, but we are unable to locate any evidence of such an objection aside from this reference by the district court. Nor has Griffin identified any portion of the record demonstrating an objection to instruction 53A. The question is what effect Griffin's approval of instruction 53A had

---

7. As we discuss below, Congress responded to the Supreme Court's decision in *Ratzlaf* by deleting the statutory willfulness requirement in the Riegle Community Development and Regulatory Improvement Act of 1994, Pub.L. No. 103–325, § 411, 108 Stat. 2160, 2253 (1994) (codified at 31 U.S.C. §§ 5322(a), (b), 5324(c) (Supp.1995)). This amendment became law after the conclusion of the trial.

upon any previous objection because alone it amounts to a waiver for the purpose of appellate review.

This statement constituted an abandonment of whatever previous objection Griffin may have made to the relevant instructions. Accordingly, the statement of preference amounted to a waiver of the right to claim error on appeal with regard to instruction 53A. The district court made it clear that it contemplated offering one of the two proposed instructions and asked the defendants for their input. At this point, it was incumbent upon counsel to voice any objections to either or both of the proposals. FED.R.CRIM. P. 30. Instead, Mr. Lopez confirmed his preference for instruction 53A, and this statement constituted approval of that instruction and extinguished any right to appellate review. Griffin concedes as much by failing to identify any portion of the record illustrating his preservation of that issue.

■ The difference between waiver and forfeiture has important consequences. One who forfeits his rights by failing to assert them in a timely fashion, *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944), does not lose the benefit of appellate review, but a person's "intentional relinquishment or abandonment of a known right," *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), precludes such review. *United States v. Olano,* 507 U.S. 725, 730–34, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993). One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error. *Id.* at 733–34, 113 S.Ct. at 1777.

■ A waiver's operative force depends upon the context in which it is made and its precise character. As the Supreme Court explained in *Olano,*

> Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.

507 U.S. at 733, 113 S.Ct. at 1777 (citations omitted). The right at issue in the present case—to have the jury instructed in conformity with applicable law—has been an element in several of this court's recent decisions. See *United States v. Ross,* 77 F.3d 1525, 1538–42 (7th Cir.1996); *United States v. Espino,* 32 F.3d 253, 258–59 & n. 5 (7th Cir. 1994); *United States v. Lakich,* 23 F.3d 1203, 1207–08 (7th Cir.1994). The touchstone of our inquiries in those cases was whether and to what extent the defendant had actually approved of the jury instructions assigned as error on appeal.

■ The right to object to jury instructions on appeal is waived if the record illustrates that the defendant approved of the instructions at issue. We do not require the defendant personally to waive objection, nor is the district court required to address the waiver question directly to the defendant. The waiver must, however, arise out of voluntary affirmative conduct, consistent with the proactive description of waiver in *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023 ("intentional relinquishment or abandonment").

Turning to the present appeal, we find that Griffin approved of the willfulness instruction by agreeing with the district court's indicated choice to use that instruction. His counsel explicitly confirmed the district court's belief that the defendants "would prefer 53A." In both *Espino* and *Lakich,* defense counsel also explicitly indicated acceptance of the instructions at issue. 32 F.3d at 259 n. 5; 23 F.3d at 1208. It would be facile to deny that this case presents less crystalline facts. But we are convinced that the essence of the record below is that Griffin accepted instruction 53A at the instruction conference. His acceptance equates to approval of that instruction and constitutes a waiver of any objection to that instruction on appeal.

B

■ Rux forfeited his right to pursue the issue of an improper jury instruction on appeal. He, like Griffin, fails to identify any portion of the record indicating his objection to instruction 53A. Nor are we able to locate any evidence of his objection other than the district court's reference to an unidentified

objection at the jury instruction conference. Rux's failure to object qualifies as a forfeiture, see *Yakus,* 321 U.S. at 444, 64 S.Ct. at 677, and we will accordingly review the instruction only for plain error. *Olano,* 507 U.S. at 730–34, 113 S.Ct. at 1776–77; FED. R.CRIM. P. 52(b).

■■■ Plain-error review entails the four-step regimen described in *Olano,* 507 U.S. at 732–36, 113 S.Ct. at 1777–78. *See Ross,* 77 F.3d at 1538. Our plain error review is particularly light-handed in the context of jury instructions. "[I]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977). Reversals for plain error are infrequent because of the requirement that the error in the instructions be "of such a great magnitude that it probably changed the outcome of the trial." *United States v. Douglas,* 818 F.2d 1317, 1320 (7th Cir.1987). The first step in our inquiry is to determine if the instructions constituted error.

■■■ We will review the instructions in light of the Supreme Court's construction of 31 U.S.C. § 5322(a) in *Ratzlaf.* Congress deleted the statutory willfulness requirement identified in *Ratzlaf* in the Riegle Community Development and Regulatory Improvement Act of 1994, Pub.L. No. 103–325, § 411, 108 Stat. 2160, 2253 (codified at 31 U.S.C. §§ 5322(a), (b), 5324(c) (Supp.1995)). The amendment was a direct response to *Ratzlaf,* see H.R. CONF. REP. NO. 652, 103d Cong., 1st Sess. 147, 194, *reprinted in* 1994 U.S.C.C.A.N. pp. 1881, 1977, 2024, but it did not take effect until after the conclusion of Rux's criminal trial. The amended statute does not prescribe that it be applied retrospectively, and it therefore does not affect our review of the jury instructions in this appeal. *See Landgraf v. USI Film Products,* — U.S. —, —, 114 S.Ct. 1483, 1496–1505, 128 L.Ed.2d 229 (1994); *Mojica v. Gannett Co., Inc.,* 7 F.3d 552, 557–59 (7th Cir.1993) (en banc), *cert. denied,* — U.S. —, 114 S.Ct. 1643, 128 L.Ed.2d 363 (1994); *DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1387–93 (10th Cir.1990),

*cert. denied,* 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991).

■■■ The Supreme Court did not articulate in *Ratzlaf* a precise jury instruction capturing the meaning of willfulness in the context of 31 U.S.C. § 5322(a). *See* 510 U.S. at —, 114 S.Ct. at 663 (stating that conviction under § 5322(a) requires a jury to find that defendant "knew the structuring in which he engaged was unlawful"). The Court held that Congress intended for there to be an ignorance of law defense to liability under § 5322(a) and the provisions of Title 31 to which it applies. *Id.* at ——— ——, 114 S.Ct. at 662–63. There are two commonly accepted definitions of willfulness. One refers to an actor's awareness of his conduct (i.e., that it be intentional), and the other refers to an actor's conscious awareness of both his conduct and its illegality (i.e., that it be intentional conduct that the actor knows to be a violation of law). *Cheek,* 498 U.S. at 207–09, 111 S.Ct. at 614 (Scalia, J., concurring). The *Ratzlaf* Court's construction of § 5322(a) invokes the latter definition because it provides for a defense based upon ignorance of the law. Under *Ratzlaf,* the government had to prove that Rux voluntarily and intentionally violated a known legal duty not to structure transactions in violation of § 5324.

The district court's charge to the jury adequately conveyed the *mens rea* requirements of § 5322(a). It reads as follows:

> To sustain the charge of unlawfully structuring a transaction as alleged in Counts 4, 13 and 17 of the indictment the government must prove the following propositions: first, that the defendant had knowledge of a financial institution's duty to report currency transactions in excess of $10,000, or that defendant had knowledge of the currency transaction reporting requirements; second, with such knowledge defendant willfully structured or attempted to structure the transaction for the purpose of evading the currency transaction reporting requirements; third, that the transaction involved one or more domestic financial institutions.

\* \* \*

When the word "willfully" is used in these instructions, it means the voluntary and intentional violation of a known legal duty, that is, with a purpose to evade a known federal currency transaction reporting requirement. An act is willfully done if done voluntarily and intentionally as distinguished from accidentally, inadvertently or negligently. Willfulness may be inferred from all the facts and circumstances in evidence.

Rux argues that this instruction "transmogrified" the specific intent requirement identified in *Ratzlaf* into a general intent requirement. His argument is not well taken.

The district court explained the two elements of willfulness as required by § 5322(a): the knowledge of a legal duty and the voluntary and intentional violation of that duty. This language instructed the jury to determine whether the government had demonstrated that Rux possessed the required state of mind with respect to his actions and their unlawful nature. By its verdict, the jury indicated that the government carried its burden, and we find no error in the instruction it followed in reaching that decision.

## IV

Griffin and Rux challenge the sufficiency of the evidence to support their convictions for money laundering under 18 U.S.C. § 1956(a)(1)(B). Griffin also alleges that the evidence was insufficient to support the jury's finding of a single conspiracy between him and Scurlock in violation of 21 U.S.C. § 846, and Rux challenges the sufficiency of the evidence supporting his conviction for aiding and abetting the cocaine distribution conspiracy under 18 U.S.C. § 2.

A refrain in appeals involving challenges to the sufficiency of the evidence is the onerous burden borne by the appellants. We view the evidence in the light most favorable to the government and then ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443

U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We will reverse a conviction "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez,* 978 F.2d 1463, 1468–69 (7th Cir.1992). Having set the crossbar, we must determine whether the appellants' arguments clear it.

### A

Griffin's and Rux's first arguments implicate those counts of the third superseding indictment that charged them jointly with violations of 18 U.S.C. § 1956(a)(1)(B), stemming from the conversion of tainted United States currency into cashier's checks.[8] The money laundering statute of Title 18 proscribes an array of financial transactions involving the proceeds of specified unlawful activities. The pertinent part of the statute reads:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

\* \* \*

(B) knowing that the transaction is designed in whole or in part-

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine or not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B). To succeed in a § 1956(a)(1)(B)(i) prosecution, the government must prove that a defendant knowingly engaged in a financial transaction using the

---

8. Count three of the third superseding indictment charged Griffin with violating 18 U.S.C. § 1956(a)(1)(B)(i) when he purchased a 1987

Chevrolet Corvette on May 12, 1988, for $30,823. Griffin did not mount any challenge to his conviction for this count either in this appeal.

proceeds of a specified unlawful activity with the intent "to conceal one or another of the enumerated attributes of the proceeds involved." *United States v. Jackson*, 935 F.2d 832, 838–39 (7th Cir.1991). Subsection (ii) of § 1956(a)(1)(B) requires the same mens rea concerning the taint of the proceeds involved in the transaction but requires that the government prove the defendant engaged in the transaction with the intent to avoid a currency transaction reporting requirement of either state or federal law. 18 U.S.C. § 1956(a)(1)(B)(ii); *accord United States v. Gilliam*, 975 F.2d 1050, 1056 (4th Cir.1992). The transaction reporting requirements of federal law require domestic financial institutions to file a currency transaction report when they conduct a transaction for the payment, receipt, or transfer of United States currency in any amount greater than $10,000. 31 U.S.C. § 5313; 31 C.F.R. § 103.22(a)(1).

The government presented evidence that Griffin and Rux used the proceeds of Griffin's cocaine distribution business to finance several purchases of real property by REIS and that Rux directed a scheme to evade the currency transaction reporting requirements of 31 U.S.C. § 5313 by converting Griffin's cash into cashier's checks in amounts less than $10,000. The cornerstone of the government's case against both men was the testimony of Terence Ferguson, a former associate of Rux who entered into a plea agreement with the government after being named as a coconspirator in an earlier indictment. The government buttressed Ferguson's recitation of events by introducing records of financial transactions involving the cashier's checks and by eliciting the analyses of Special Agents Kevin Moss and William Maloney of the Criminal Investigation Division of the Internal Revenue Service. Taken as a whole, this body of evidence demonstrated Griffin's and Rux's continuing pattern of laundering the proceeds of Griffin's cocaine business through REIS's and Griffin's purchases of real property using cashier's checks obtained in violation of the currency transaction reporting laws.

▮▮▮▮ Griffin and Rux have not mounted a cogent attack on the government's evidence. They ask us to reweigh the evidence in the hope that we might reach a conclusion different from the jury's. This approach is doomed to failure, for "[i]t is not our function to reweigh the evidence, nor to substitute our judgment for that of the factfinder." *Ross*, 77 F.3d at 1542 (citing *United States v. Hatchett*, 31 F.3d 1411, 1416 (7th Cir.1994)). They propose inferences that one might draw from the evidence, ignoring the rule that we are obliged to adopt all reasonable inferences in the government's favor on challenges to the sufficiency of the evidence. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. They also suggest that we reassess the testimony of certain witnesses in the light of their spirited analyses of the witnesses' credibility. Again, this manifests an incorrect view of our role. It is for the jury—not the court of appeals—to judge the credibility of witnesses, and attacks on witness credibility are insufficient to sustain a challenge to the sufficiency of the evidence. *See United States v. Maholias*, 985 F.2d 869, 874 (7th Cir.1993) (citing *United States v. Johnston*, 876 F.2d 589, 593 (7th Cir.), *cert. denied*, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989)).

Griffin and Rux have failed to do more than reargue their case, discredit witnesses, and suppose alternative inferences. Accordingly, we will not engage in a blow-by-blow description of the evidence, the witnesses, or the inferences. We take all inferences in the government's favor and will not inquire whether this witness or that witness should have been accorded the credibility we may infer was assigned by the jury in light of its verdict.

The appellants' sufficiency arguments recall an oft-quoted adage: If the law is against you, argue the facts; if the facts are against you, argue the law; and if they both are against you, pound the table and attack your opponent. *See, e.g., United States v. Dickey*, 736 F.2d 571, 592 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). The government presented direct evidence in the form of testimony by Ferguson and by Special Agents Moss and Maloney. It presented indirect evidence in the form of documents concerning the purchase of the cashier's checks, the real property transactions, and Griffin's income

tax returns. Griffin and Rux have failed to demonstrate that the record lacks any evidence, regardless of how it is weighed, from which the jury could reasonably have determined their guilt beyond a reasonable doubt. See *United States v. Garcia*, 35 F.3d 1125, 1128 (7th Cir.1994).

### B

■ Griffin claims that the jury's verdict on count one, which alleged his conspiracy with Scurlock to possess cocaine with intent to distribute, was inconsistent with, and not supported by, the evidence adduced by the government at trial. His argument relies in part upon two decisions from our colleagues on the Fifth Circuit expressing concern that the trend toward prosecuting multiple defendants under a single conspiracy theory requires particular vigilance by the courts. We recognize the potential for conspiracy's siren song in cases involving an amalgam of offenses, but the case before us does not implicate these concerns.

■ We characterize an appeal alleging a variance between the evidence adduced at trial and the number of conspiracies alleged in an indictment as "a challenge to the sufficiency of evidence supporting the defendant's conspiracy conviction." *United States v. Testa*, 33 F.3d 747, 750 (7th Cir.1994). These challenges must surmount the same high standard of persuasion described above, namely, that no evidence existed from which a rational jury could have found the existence of a single conspiracy. *United States v. Nava–Salazar*, 30 F.3d 788, 796 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994). The government was required to demonstrate at trial that Griffin knowingly joined and participated in a conspiracy with Scurlock to distribute cocaine. *United States v. Pazos*, 993 F.2d 136, 139 (7th Cir.1993). This showing could have been made with either direct or circumstantial evidence. *United States v. South*, 28 F.3d 619, 627 (7th Cir.1994); *see also United States v. Stephenson*, 53 F.3d 836, 846 (7th Cir.1995) (discussing framework of proof in conspiracy variance appeals and collecting cases).

Once again, Griffin's argument reduces to a request that we adopt inferences different from those reached by the jury and reassess the credibility of certain witnesses. As the government states in its brief, the record is replete with testimony from several cooperating witnesses concerning Griffin's and Scurlock's cooperation in the wholesale distribution of cocaine. Evidence was also presented concerning an aborted trip to California by Griffin and Scurlock during which they were to purchase cocaine. It was not necessary for the government to demonstrate that the two men identified and jointly pursued a discrete goal, such as the sale or transport of one particular kilogram of cocaine. Count one of the third superseding indictment alleged a conspiracy to possess multiple-kilogram quantities of cocaine with the intent to distribute and assorted actions in furtherance of that conspiracy. The evidence at trial was consistent with the allegations of count one, and the jury was entirely reasonable in concluding the existence of a single conspiracy between Griffin and Scurlock.

### C

■ Rux argues that there was insufficient evidence for the jury to have convicted him for aiding and abetting the cocaine conspiracy between Griffin and Scurlock in violation of 18 U.S.C. § 2, which provides that anyone who "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States is punishable as a principal. A person qualifies under this statutory proscription if he "associate[s] himself with the venture, that is participate[s] in it as something he wishes to bring about," and if "he seek[s] by his action to make it succeed." *United States v. Allen*, 10 F.3d 405, 415 (7th Cir.1993) (quoting *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir.1990)). We will affirm Rux's conviction if the evidence shows he knew of the cocaine distribution conspiracy, intended to further its success, and contributed at least one act of affirmative assistance. *United States v. Zafiro*, 945 F.2d 881, 887 (7th Cir.1991), *aff'd*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

There was sufficient evidence for the jury to have concluded that Rux knew of the conspiracy, wanted to see it succeed, and acted to further its criminal design. Ferguson testified that Rux had identified narcotics distributors like Griffin and Scurlock as ideal clients for REIS because of their need to launder and conceal the cash proceeds of their criminal activities. Ferguson also testified that the Rux-designed REIS scheme generated an exorbitant rate of interest for Griffin on his investments, and a rational (if not irrefutable) inference is that Griffin plowed much of this interest income back into the conspiracy, as suggested by the evidence of the conspiracy's steadily increasing volume of cocaine traffic. Most importantly, Rux manifested his desire to see the conspiracy flourish by helping Griffin and Scurlock conceal their ill-gotten gains from government detection and thereby continue their operation unabated. Rux's role in hatching and directing these laundering and structuring activities provided ample evidence for the jury to have been convinced beyond a reasonable doubt of his knowing, affirmative assistance to the conspiracy.

## V

Scurlock filed a posttrial motion for a new trial under FED.R.CRIM. P. 33 based upon the allegedly false testimony of two government witnesses, Joy Sanchez and Rodney Rhodes. The district court conducted a hearing on the Rule 33 motion at which it admitted evidence and heard testimony from Joy Sanchez. After receiving the evidence, the district court denied Scurlock's motion based upon its assessment of Sanchez and of the credibility of her testimony. We will review the district court's denial of Scurlock's Rule 33 motion for an abuse of discretion. *United States v. Nero*, 733 F.2d 1197, 1202 (7th Cir.1984).

### A

On our first occasion to divine the proof requirements of FED.R.CRIM. P. 33, we articulated the evidentiary showing necessary to a successful Rule 33 motion based upon witness recantation: "that the recantation is true; that the jury might have reached a different result if the witness in question had

testified truthfully; and that the witness's false testimony took the defendant by surprise." *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928). We have adhered to these requirements and have refined them as warranted by the posture of particular appeals. See *United States v. Walker*, 25 F.3d 540, 548–49 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994); *Olson v. United States*, 989 F.2d 229, 231 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). But see *United States v. Leibowitz*, 919 F.2d 482, 484–85 (7th Cir.1990) (noting diverging views among the circuits on the "surprise" prong of the *Larrison* test and expressing skepticism of its continued validity), *cert. denied*, 499 U.S. 953, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991).

■ The district court concluded that Scurlock's motion floundered on the first hurdle of the Rule 33 calculus, and that decision was a sound exercise of discretion. Scurlock predicated his claim upon the substance of a notarized statement by Sanchez given after the conclusion of the trial. In that statement, Sanchez averred that she fabricated her trial testimony, that she knew nothing about Scurlock's distribution of cocaine, and that her testimony was partly motivated by the pressure applied to her by IRS agents and assistant U.S. attorneys. The district court evaluated these claims in the light of her testimony at the hearing and at the trial, and it found substantial reasons not to take her recantation at face value.

The district court expressed skepticism about the truthfulness of Sanchez's recantation, and this is consistent with our own views of recantations in general. *See, e.g., Leibowitz*, 919 F.2d at 483. *See also United States v. Kamel*, 965 F.2d 484, 494 n. 25 (7th Cir.1992) (quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir.1991), *cert. denied*, 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992)). The district court found additional support for its position in the circumstances surrounding Sanchez's recantation. It found that Sanchez's trial testimony might have been motivated, in part, by the government investigation, but that her motivation accrued from the possibility that

she might face prosecution for her role in the conspiracy. The district court also found good reasons to question her credibility, a factor in this calculus on which we defer to the district court. *See United States v. Johnson,* 327 U.S. 106, 111–12, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946). The timing of her recantation also casts Scurlock's motion in an unflattering light. Taken together, these facts satisfy us that the district court committed no error in finding Sanchez's trial testimony not to have been false. Accordingly, the court did not need to consider the second and third elements of the *Larrison* inquiry.

### B

 The district court did not discuss the allegations concerning Rhodes's perjury in its denial of the Rule 33 motion. The standard governing the adjudication of a Rule 33 motion based on perjured testimony mirrors the *Larrison* test described above, and the district court's duty in reviewing alleged perjury is discharged if it determines that the testimony given at trial was not false. *United States v. Johnson,* 142 F.2d 588, 591 (7th Cir.), *petition for cert. dismissed,* 323 U.S. 806, 65 S.Ct. 265, 89 L.Ed. 643 (1944). If the court is able to make such a determination based upon its observations of the relevant witness(es) at trial, then it is not required to hold an evidentiary hearing on the Rule 33 motion. *United States v. MMR Corp.,* 954 F.2d 1040, 1046 (5th Cir. 1992). In addition, a district court's factual finding concerning the credibility of a witness is entitled to substantial deference, and we will not disturb such a finding unless it is "wholly unsupported by [the] evidence"—i.e., unless it is clearly erroneous. *Johnson,* 327 U.S. at 111–12, 66 S.Ct. at 466.

 Scurlock has failed to demonstrate clear error by the district court in its denial of the Rule 33 motion with regard to Rhodes's alleged perjury. Scurlock's evidence of the perjury consisted of written correspondence—two greeting cards purportedly sent by Rhodes to Sanchez—and a statement by Sanchez in her recantation that Rhodes had "pursued" her. Scurlock claims this evidence counters Rhodes's assertion at

trial that he was not romantically interested in Sanchez and demonstrates Rhodes's bias against Scurlock that motivated his damaging testimony concerning Scurlock's involvement in the distribution of cocaine.

The district court's assessment of the evidence concerning Rhodes's alleged perjury necessarily hinged upon its view of Sanchez's recantation. The messages contained in the greeting cards do suggest something more than detached acquaintance between Rhodes and Sanchez but do not conclusively demonstrate Rhodes's romantic attraction to Sanchez. In fact, the correspondence indicates nothing more than Rhodes's impression that he and Sanchez enjoyed a close personal relationship. Sanchez's recantation thus provided the only real evidence of Rhodes's romantic attraction to her.

In light of these circumstances, the district court's ruling on the Rule 33 motion did address the question of Rhodes's testimony. In its ruling, the district court expressed its doubts as to Sanchez's credibility, and it found that she had testified truthfully at the trial. It follows from this conclusion that the district court did not believe her recantation. This assessment of the recantation was fatal to Scurlock's allegations against Rhodes. In addition, the district court had ample opportunity to evaluate Rhodes's credibility during his testimony at the trial. We find no clear error in the district court's implicit conclusion that the allegations of perjury were without merit, and we conclude that the district court did not abuse its discretion in denying Scurlock's motion for a new trial.

The convictions of Steven C. Griffin, Marvin M. Rux, and Andrae Scurlock are AFFIRMED.