**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Sonia IRWIN, Defendant–Appellant.**

No. 97–3105.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1998.

Decided July 1, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied July 28, 1998.

Ronald S. Safer (argued), Office of the U.S. Atty., Criminal Div., Chicago, IL, for Plaintiff–Appellee.

William H. Theis (argued), Shellow, Shellow & Glynn, Milwaukee, WI, for Defendant–Appellant.

Before RIPPLE, MANION, and EVANS, Circuit Judges.

MANION, Circuit Judge.

A federal jury convicted Sonia Irwin of aiding and abetting a drug conspiracy in violation of 21 U.S.C. § 846. On appeal, Irwin makes two substantial attacks on her conviction: First, she argues that as a matter of law one cannot aid and abet a conspiracy by assisting the conspirators after they have made their unlawful agreement, at which point the crime of conspiracy is complete. Second, Irwin argues that the government's evidence was insufficient to support her conviction. Based on the existing law in this circuit and because the essential evidence proffered by the government was sufficient to support her conviction, we affirm.

## I. Facts

This case involves an unlikely alliance. Sonia Irwin and Gregory Shell were childhood friends but they took seemingly divergent paths: Irwin became a Chicago police officer

and Shell became the second-in-command of a gang that controlled much of Chicago's street-level drug trade. But they formed a romantic relationship as adults and that relationship led Irwin down the same criminal path Shell was traveling—one that eventually subjected Irwin to a lengthy federal prison sentence.

The background of this case begins in the late 1960's when Larry Hoover and David Barksdale, the leaders of two Chicago street gangs, merged their gangs to form the Black Gangster Disciple Nation, which name was later shortened to Gangster Disciples. Hoover and Barksdale ruled the unified gang as "King Larry" and "King David." But Barksdale's shared reign ended when he was killed soon after the gangs merged. In 1973 Hoover was convicted for ordering a double murder and has been incarcerated by Illinois ever since, but astonishingly he continued to rule the Gangster Disciples from prison. Under Hoover's leadership the gang rose to prominence, controlling a large part of the street-level drug trafficking in the Chicago area. At its height in the early 1990's, the gang's drug sales brought in about $100 million per year.

In the 1980's, Hoover jettisoned the old monarchical nomenclature of the gang's top leaders in favor of a more modern, corporate nomenclature. He called himself the Chairman of the Board and formed his closest allies into two Boards of Directors: an incarcerated Board for the leaders in prisons and an unincarcerated Board for the leaders on the outside. The Directors oversaw all of the gang's operations. Below the Directors were the Governors, who were charged with running narcotics sales in specified areas throughout Chicago and its suburbs. A Governor typically had about 1,000 gang members, called Foot Soldiers, working under him. A Governor could control this many gang members because he had two more layers of leaders beneath him: the Regents, who controlled smaller areas within a Governor's territory, and Coordinators, who controlled smaller areas within a Regent's territory. In 1990, Hoover appointed Shell—who was already a member of the unincarcerated Board—to second-in-command, charged with

controlling the gang's activities on the outside while Hoover was in prison. (About the same time Shell and Irwin, who had been a Chicago police officer since 1987, began living together.)

The Gangster Disciples specialized in street-level, low-price sales of small quantities of drugs. This presented two problems for the gang's leaders: the gang needed to control territory in which it could make sales, and needed to organize the actions of and collect the proceeds from the thousands of Foot Soldiers carrying on the day-today sales. (A gang-conducted census revealed that it had anywhere from 6,000 to 30,000 members selling drugs.) The Coordinators, Regents, and Governors had to control which Foot Soldier sold where to ensure that the gang did not compete for sales against itself. If there was more demand in an area than the Gangster Disciples had Foot Soldiers to supply, the gang permitted dealers unaffiliated with a gang, called "Neutrons," to sell their wares so long as they paid a tax to the Gangster Disciples. But the Gangster Disciples violently suppressed any rival gang's attempt to sell in Gangster Disciple territory.

In order to funnel proceeds from the enormous number of small sales to the gang's leaders, Hoover decided to charge each gang member certain dues, called the "count" or the "weekly." This was in effect a tax or franchise fee for doing business as a Gangster Disciple, similar to the tax levied on Neutrons. The Governors were responsible for getting the weekly in to the Directors, and Governors who owed back taxes were likely to find themselves the unwilling recipients of a beating. Hoover also demonstrated his vision and organizational flair by forming a political action committee for the gang, called 21st Century V.O.T.E., and imposing another tax on gang members called the "political," some of the revenue from which was funneled into the PAC. The gang also sponsored music concerts, with mandatory attendance for gang members, and used the concerts to launder drug money.

In 1993, apparently dissatisfied with his profits as Chairman, Hoover developed a scheme called "One Day a Week" or "Nation Dope." One day each week, everyone selling

within the gang's territory had to sell drugs for Hoover himself. Hoover estimated that this would net him $200,000 to $300,000 each week. He thought there might be some resistance to Nation Dope, so he instructed the Directors to put the word out that anyone refusing to sell Nation Dope would be shot. Hoover's analysis was simple: "One day a week ain't much to ask for your life."

Hoover knew that his phone calls in prison could be monitored, so whenever a Director began to discuss business matters on the phone, Hoover cut him off and told him to come to the prison to see Hoover in person. So the Directors had to go to whichever prison Hoover was currently in to receive their instructions. When Hoover was eventually transferred to Illinois' Vienna facility, traveling became a hardship because Vienna is located in the southern tip of the state, about a six-hour drive from Chicago. But the Directors regularly made this trip, and Hoover had a stream of visitors. In the fall of 1993, the government got a court order permitting it to place a transmitter in the visitor badge given to gang leaders who came to see Hoover. The government was thus able to monitor the conversations of the gang's inner leadership for six weeks until the transmitter was discovered.

In November 1993, while Shell visited Hoover at Vienna, Shell told the Chairman that Shell planned to buy a restaurant, called June's Shrimp on the Nine, for $15,000. Hoover thought this was a good idea. In fact, he wanted other gang members to buy property like real estate rather than purchasing things like cars. Shell planned to turn the restaurant over to his mother, who was an experienced food service provider. Shell told Hoover that Irwin would do the books for the business and use her status as a police officer to obtain a few guns to keep at the restaurant. From this conversation, on the surface, at least, it appears Shell planned to have this restaurant operate as a legitimate business, though one initially purchased with drug proceeds.

As it turned out, Irwin, not Shell, purchased the restaurant. On December 8, 1993, Irwin and Shell met with the seller and his attorney, who had prepared a contract of sale, a promissory note, and a security filing. The purchase price was $13,500, with $8,000 due at the closing. Irwin signed the contract as buyer and signed the promissory note covering the remaining $5,500. She paid the initial $8,000 with a check drawn on her account. At trial, the government argued that this money ultimately came from Shell and that Irwin was acting as purchaser in name only, but the government had no direct evidence of this. After the sale, the seller's attorney helped Irwin draw up articles of incorporation and make the necessary filings with the state so that she could run the restaurant through a corporate entity. She maintained the corporate filings for two years, but failed to do so in 1995 and the state dissolved the corporation.

Soon after Irwin purchased the restaurant, the government got a court order to tap the restaurant's phone. Shell's mother apparently had nothing to do with the restaurant. But Irwin spent at least some time working there: the government recorded phone calls in which she ordered food from suppliers and took orders from customers. Shell also worked in the restaurant: in one recorded conversation with another gang leader, Shell said that he was busy cooking for a funeral that the restaurant was catering. Shell and others often used the restaurant's phone to talk with coconspirators. Shell issued orders over this phone, even once notifying two Governors that their territories had been increased. And the phone was regularly used to instruct members to get the "weekly" and "political" in, although there is no evidence that the money was collected at the restaurant.

In the summer of 1994, Irwin and Shell had a temporary falling-out. On July 9, 1994, Irwin called the restaurant and asked for Shell. When he got on the line, she called him a liar and a sneak, and threatened to send the police to the restaurant: "And I'm gonna tell you somethin else, those punks up there in that restaurant, you don't get 'em from the fuck out there, I'm gonna send the police up there from now on, and I mean that, I'm lettin you know." She threatened "to get" Shell several times before she hung up. When Shell called her back, she again

threatened him: "I want your shit out of my house. I want them punks out of that restaurant, or I'm gone call the motherfucker police, *or you get it out of my name.*" (Emphasis supplied.)

Although Shell and Irwin were able to patch up their differences, time was running out for the conspiracy. On August 31, 1995, a federal grand jury handed down three separate indictments charging 39 of the gang's leaders and others with a conspiracy to sell narcotics. Irwin was named in one of the indictments with nine co-defendants. Although the indictment contained multiple counts, Irwin was named only in the first, charged with conspiracy in violation of 21 U.S.C. § 846. The substantive offense that the government charged as the object of the conspiracy was possession with the intent to distribute cocaine, crack cocaine, heroin, and marijuana, in violation of 21 U.S.C. § 841(a)(1). Irwin and six of her co-defendants went to trial beginning January 29, 1996. The government made no effort to show that Irwin had joined the conspiracy, arguing instead that she had aided and abetted it. The jury found Irwin guilty on March 6, 1996, and on August 11, 1997, the district court sentenced her to 151 months in prison and fined her $5,000. She timely appealed.

## II. Discussion

■ In attacking her conviction, Irwin makes two arguments, one general and one more specific. Her general argument is that one cannot be liable for aiding and abetting a conspiracy where one has given aid to conspirators after the conspiratorial agreement is complete. To address this argument, we must interpret the federal statute that creates aider and abettor liability, 18 U.S.C. § 2(a), and the statute covering the substantive offense that Irwin was convicted of aiding and abetting, 21 U.S.C. § 846. We address these questions of law de novo. Irwin's more specific argument is that even if such liability is possible, insufficient evidence supports her conviction. When we address this second question we look at the evidence in the light most favorable to the government and ask whether "*any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Alexander*, 135 F.3d 470, 474 (7th Cir. 1998).

### A. Aider and Abettor Liability for Assisting a Conspiracy

■ The federal criminal code recognizes two types of criminals: principals and accessories after the fact. Principals include more than merely the ones who commit the criminal act: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a); *see also Wright v. United States*, 139 F.3d 551, 552 (7th Cir.1998) ("The essence of aider and abettor liability is that a person is punished as a principal even though he did not commit the actual elements of the crime."); *United States v. Petty*, 132 F.3d 373, 377 (7th Cir.1997) ("In a sense, the essential elements of aiding and abetting serve as a substitute for the defendant's actual physical participation in the crime."). On the other hand, an accessory after the fact, one who aids after the crime has been committed, is liable for only half the maximum penalty to which the principal he assisted would be liable, to a maximum of 15 years. 18 U.S.C. § 3.

The federal statute punishing an aider and abettor as a principal has been essentially unchanged since it was enacted in 1909. See 18 U.S.C.A. § 2 (Reviser's Notes); *United States v. Pino–Perez*, 870 F.2d 1230, 1233 (7th Cir.1989) (*en banc*). The statute does not define aiding and abetting, so that has been left to the courts. The classic formula for aider and abettor liability is Judge Learned Hand's, which requires that the aider "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938). This formulation has been generally accepted. *See Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949) (quoting *Peoni*); *Central*

*Bank of Denver, N.A v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citing *Peoni* and *Nye & Nissen*), *superseded by statute in part,* 15 U.S.C. § 78t(f); *Pino-Perez,* 870 F.2d at 1235 (same); *United States v. Giovannetti,* 919 F.2d 1223, 1227 (7th Cir.1990) (same). We have broken this test into three elements: "knowledge of the illegal activity that is being aided and abetted, a desire to help that activity succeed, and some act of helping." *United States v. Zafiro,* 945 F.2d 881, 887 (7th Cir.1991) (citing *Pino–Perez* and *Peoni*) (emphasis in original), *aff'd.* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (addressing only severance issue). And in a case where the defendant, like Irwin, was convicted of aiding and abetting a drug distribution conspiracy, we stated that "[w]e will affirm [the defendant's] conviction if the evidence shows he knew of the cocaine distribution conspiracy, intended to further its success, and contributed at least one act of affirmative assistance." *United States v. Griffin,* 84 F.3d 912, 928 (7th Cir.1996) (citing *Zafiro*); *see also Petty,* 132 F.3d at 377 (essential elements of aiding and abetting are "knowledge of the crime, intent to further the crime, and some act of help by the defendant").

▪ Irwin was convicted of aiding and abetting a conspiracy in violation of 21 U.S.C. § 846. That statute provides:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

To convict a defendant of conspiracy under § 846, the government need not show that the defendant or his co-conspirators committed an overt act in furtherance of the conspiracy; the agreement to commit one of the covered substantive offenses is the crime. *United States v. Shabani,* 513 U.S. 10, 14, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994). Re-

jecting the defendant's argument that he was being punished for his thoughts, the Court noted that "the criminal agreement itself is the *actus reus." Id.* at 16, 115 S.Ct. 382; see also *Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.") (quoted with approval in *Shabani,* 513 U.S. at 16, 115 S.Ct. 382); *United States v. Blankenship,* 970 F.2d 283, 285 (7th Cir.1992) ("Conspiracy is agreement to violate the law."). We stated that "[t]o join a conspiracy, then, is to join an agreement rather than a group." *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir. 1991). Because when drug conspirators agree to violate one of the specified offenses, all the elements of 21 U.S.C. § 846 have been met and the conspirators can be convicted, Irwin argues that one who assists after the agreement is made is an accessory after the fact. Although Irwin's argument has some logical appeal, we must reject it.

Irwin candidly acknowledges that she is asking us to overturn *United States v. Galiffa,* 734 F.2d 306 (7th Cir.1984), where we rejected an identical argument, but she argues that subsequent case law like *Shabani* has invalidated *Galiffa.*[1] In *Galiffa,* the defendant argued that because a conspiracy is an agreement to commit an unlawful act, one can only aid and abet a conspiracy by aiding the formation of the agreement, such as bringing the parties together. We held: "We believe this interpretation of the conspiracy statute is too restrictive.... [A] person can be guilty of aiding and abetting a conspiracy when the person commits an act designed to further the conspiracy." *Id.* at 309. We have continued to follow this holding. *See United States v. Pearson,* 113 F.3d 758, 762 (7th Cir.1997) (one who assisted drug sales for conspiracy after it was formed would be aider and abettor of that conspiracy); *Griffin,* 84 F.3d at 929 (lawyer who assisted conspirators in laundering their

---

1. Irwin cites *Shabani* as new law contradicting our prior cases, but *Shabani* is not the sort of new Supreme Court decision that usually warrants reexamining our prior decisions because, at least for this circuit, *Shabani* adopted no new law. In reversing the law of one circuit, the

Court affirmed the law of 11 other circuits including this one. *Shabani,* 513 U.S. at 12, 115 S.Ct. 382. The Court in *Shabani* in fact relied on this court's analysis of conspiracy law. *Id.* at 14, 115 S.Ct. 382 (quoting *United States v. Sassi,* 966 F.2d 283, 284 (7th Cir.1992)).

drug money after the conspiracy was formed was aider and abettor of the conspiracy); *Zafiro*, 945 F.2d at 887–88 (one who permits her apartment to be used by members of a drug conspiracy to store their drugs was aider and abettor of the conspiracy).

We acknowledge that there is some logic to Irwin's argument that treating the crime of conspiracy as having been committed when the agreement is made conflicts with treating one who assists after the agreement is made as an aider and abettor rather than accessory after the fact. But we frequently treat a conspiracy as an ongoing enterprise and analyze it with respect to the conspiracy's object, goal, or purpose. Section 846's definition of the offense itself makes the conspiracy's object critical: it covers only those conspiracies whose object is to violate specific federal drug laws. And we define a conspirator by referring to the conspiracy's purpose. *See United States v. Jarrett*, 133 F.3d 519, 533 (7th Cir.1998) ("In order to prove that [the defendants] were members of the charged conspiracy, the Government was required to prove that they knew of the conspiracy and that they intended to join and associate themselves with the conspiracy's criminal purposes."). The rule for when a conspirator has left the conspiracy also refers to the conspiracy's purpose. *See United States v. Wilson*, 134 F.3d 855, 863 (7th Cir.1998) ("To withdraw from a conspiracy, a defendant must terminate completely his active involvement in the conspiracy, as well as take affirmative steps to defeat or disavow the conspiracy's purpose."). And the co-conspirator exception to the hearsay rule, Fed. R.Evid. 801(d)(2)(E), refers to statements made "during the course and in furtherance of the conspiracy." A conspirator is liable for the substantive crimes of his co-conspirators, again, when those crimes are committed in furtherance of the conspiracy. *Townsend*, 924 F.2d at 1388–89.

██ Thus, we find no contradiction in concluding that one can be guilty of aiding and abetting the crime of conspiracy by furthering the success of the conspiracy's object, goal, or purpose. This is so because when in assessing liability for the conspirators themselves these terms guide our analysis. The difference between an aider and abettor and an accomplice after the fact is not judged simply by asking whether the one aided could, when the aid is given, already be found guilty of the crime. Accessories after the fact are ones who give aid after the criminal endeavor has ended to keep the one aided from being caught or punished. *See United States v. Osborn*, 120 F.3d 59, 63 (7th Cir. 1997) (elements of accessory after the fact are underlying crime committed by someone other than the defendant, knowledge of crime, and "assistance by the defendant in order to prevent the apprehension, trial or punishment of the offender") (quoting *United States v. Lepanto*, 817 F.2d 1463, 1467 (10th Cir.1987)). Conspiracies can continue for a long time. (The conspiracy in this case lasted more than 20 years.) As we noted in *Galiffa*, if we accepted Irwin's argument, we would create a loophole for persons who do not join the conspiracy but who render valuable assistance that furthers its goals. 734 F.2d at 310. We see no reason to overrule our prior law.

## B. Sufficiency of the Evidence Supporting Irwin's Conviction

██ We next turn to the second issue in this case: whether the government presented sufficient evidence to support Irwin's conviction. We first take a closer look at the requirements to prove aider and abettor liability. As we have said, our cases have usually stated that the government must prove three elements: knowledge of the crime, a desire or intent to make the crime succeed, and at least one act of affirmative assistance. *See, e.g., Griffin*, 84 F.3d at 928; *Petty*, 132 F.3d at 377. Irwin does not contest her knowledge of the conspiracy and Shell's involvement in it but rather focuses her arguments on the second and third elements. In many cases, including this one, those elements are intertwined. In this case, the government had no direct evidence that Irwin intended to further the conspiracy, so Irwin's intent must be inferred from circumstantial evidence. *United States v. Gabriel*, 810 F.2d 627, 636 (7th Cir.1987) ("Proof of this criminal intent may be inferred from the surrounding circumstances."); *United States v. Boykins*, 9 F.3d 1278, 1284 (7th Cir.1993)

(same). Such circumstantial evidence can include evidence that the defendant had a motive to further the crime such as the defendant having a pecuniary stake in the success of the crime, *see, e.g., Giovannetti*, 919 F.2d at 1227; *Blankenship*, 970 F.2d at 286 (discussing pecuniary stake in differentiating onetime supplier from co-conspirator), or the defendant having a personal motive such as his relationship to one of the principals, *see Pearson*, 113 F.3d at 762 (defendant had father-and-son-like relationship with principal). And the aid that the defendant gave to the criminal enterprise can be used to support the inference that the defendant by giving the aid intended to further the crime; the law imputes to a defendant the intent to do that which is the natural consequence of his knowing acts. *See Jacks v. Duckworth*, 651 F.2d 480, 486 (7th Cir.1981) (no error in instructing jury that everyone is presumed to intend the natural consequences of his voluntary acts); *United States v. Machi*, 811 F.2d 991, 998 (7th Cir.1987) (intent to obstruct justice could be proved by evidence that such obstruction was natural consequence of defendant's acts); *Trzcinski v. American Casualty Co.*, 953 F.2d 307, 313 (7th Cir.1992) ("the law presumes 'every man to intend the natural consequences of his acts'") (quoting *Tenore v. American and Foreign Insurance Co.*, 256 F.2d 791, 794–95 (7th Cir.1958)). So when a defendant knowingly renders aid to a criminal endeavor and the natural consequence of such aid is to further the crime and help it succeed, the jury is entitled to infer that the defendant intended by his assistance to further the crime. In a case such as this where the evidence of the defendant's intent must be inferred from the aid given, the second and third elements really merge and our review focuses on whether the aid given was sufficient to support the inference of intent to further the crime.

Because the aid that the defendant gave often pulls double duty—as direct evidence of affirmative assistance and circumstantial evidence of intent—we have previously suggested modifying aider and abettor analysis to focus only on the amount of assistance knowingly given. *See Zafiro*, 945 F.2d at 887–888. In *United States v. Ortega*, 44 F.3d 505, 508 (7th Cir.1995), we suggested abandoning the intent or desire element altogether in favor of asking whether the assistance was "deliberate and material." We stated:

> But what if he merely rendered assistance, without being compensated or otherwise identifying with the goals of the principal? We do not think it should make a difference, provided the assistance is deliberate and material. One who, knowing the criminal nature of another's act, deliberately renders what he knows to be active aid in the carrying out of the act is, we think, an aider and abettor even if there is no evidence that he wants the acts to succeed—even if he is merely acting in the spirit of mischief. The law rarely has regard for underlying motives.

*Id.* at 508. As a practical matter, replacing the intent element in favor of a requirement of material assistance would change nothing in cases like this where the defendant's aid is the only evidence of intent. In such a case the second and third elements merge, and the aid must be sufficient to support the inference of intent and the inference that assistance was given. In *Ortega* we referred to a case where a defendant rendered deliberate and material assistance but there was "no evidence that he wants the [criminal] acts to succeed," 44 F.3d at 508. It is unlikely there will be a case in which a defendant deliberately gives material assistance but where there is no evidence of the defendant's desire for the crime to succeed, indicating intent. Material assistance deliberately given is *itself* evidence of intent.

But dropping the intent element might significantly affect cases—rare though they must be—where the assistance was quite minor but where there is other evidence of intent, such as a pecuniary interest, a personal motive, or certainly overheard or recorded comments indicating a desire for the crime to succeed. If the intent element were replaced by a materiality requirement, in such a case the defendant presumably could not be convicted because the assistance given, though done with the intent to further the crime, would not be material. Cf. *United States v. Medina*, 32 F.3d 40, 45 (2d Cir.1994) (reversing conviction of aiding and abetting carrying firearm in violation of 18 U.S.C. § 924(c)

where defendant knew of crime, intended to further its success, but he was unable to complete an act of assistance). In *Zafiro* and *Ortega* we recognized a reality in the administration of aider and abettor liability: in many cases, probably the large majority, discussion of "intent" *per se* is not relevant because the deliberate aid itself is what supports the finding of intent to further the crime. But in some cases, although this is not one of them, there will be other, more direct evidence of intent; in such cases, the jury might not have to rely on the substantiality of the assistance given to support the inference of intent. Thus we see some value in retaining the intent element even though, as a practical matter, that element drops away in most cases.

■ Irwin seems to argue that the government's failure to show that she had any pecuniary interest in the success of the conspiracy is significant. It is not. The defendant's *motive* to render aid is irrelevant. *Ortega*, 44 F.3d at 508. As we noted in *Pearson*, it was not significant what motivated the defendant to help the conspiracy; what mattered was the defendant knew that the conspiracy involved something illegal and gave whatever assistance was asked of him to help make the conspiracy's success " 'more likely.' " 113 F.3d at 762 (quoting *Ortega*, 44 F.3d at 508). Similarly, in this case it is irrelevant whether Irwin intended to assist the conspiracy out of love for Shell, a pecuniary gain, a sense of mischief, a dislike for her fellow police officers, or a general desire to see more crimes succeed. Whatever motive or combination of motives inspired her actions, the significant question is whether she knew of the crime and by her actions intended to further it; and her intent can be inferred from the natural consequences of her knowing acts. On the other hand, the government's arguments seem to suggest, although they recognize the intent element, that knowledge of the crime and any assistance is sufficient to prove aiding and abetting, even if there is no other evidence of intent and the assistance is not material. None of our prior cases has suggested this is the appropriate test.

As we stated, the record here does not contain direct evidence or other types of circumstantial evidence of intent, so to affirm Irwin's conviction we must find that the aid she gave sufficiently supports the jury's inference that by giving it she intended to further the illegal object of the conspiracy. We have said that some forms of assistance are trivial and cannot be the basis of this inference. In *Zafiro*, we gave the example of a store clerk who sells a dress to a prostitute knowing that she will use the dress to ply her illegal trade. 945 F.2d at 887. While such a clerk acts knowingly and the act of selling the dress can be said to be some affirmative assistance, such trivial assistance is too far removed from the prostitute's criminal endeavor to support the inference of intent. There are various descriptions that could apply to this analysis, such as whether the assistance was "essential," *Zafiro*, 945 F.2d at 887, or "material," *Ortega*, 44 F.3d at 508, and Irwin suggests that we look to whether the assistance was "substantial," relying on the language of 15 U.S.C. § 78t(f) (relating to aiders and abettors of securities crimes). One could also ask whether the natural consequences of the defendant's acts of assistance were that the crime was more likely to succeed. Cf. *Ortega*, 44 F.3d at 508 (defendant "rendered assistance that he believed would (whether or not he cared that it would) make the principal's success more likely—in other words did what he could do or what he was asked to do to help make success more likely."). While all these different ways of looking at the analysis can be helpful, we decline Irwin's invitation to adopt one of them as "the test." The ultimate test is that of *Jackson v. Virginia*: whether the evidence presented was sufficient to support a rational inference of intent to further the crime beyond a reasonable doubt. On the one end of spectrum, trivial assistance cannot support such an inference and on the other end critical assistance clearly will. There is no magic formula to easily determine on which side of the sufficiency line the evidence in a case falls. Like all challenges to the sufficiency of the evidence, we simply have to carefully examine the evidence supporting the conviction and decide whether a rational jury could find guilt beyond a reasonable doubt.

Here, the government argues that Irwin furthered the conspiracy in three ways: she permitted Shell to use a charge card on her account; she assisted Shell in renting cars so that he could visit Hoover in prison; and she was involved in purchasing and running June's Shrimp on the Nine. We will look at each of these in turn.

### 1. *Shell's use of Irwin's charge card.*

■ Irwin had an American Express account on which Shell was a card holder, that is, Shell had a card with his name on it but purchases made with his card were billed to Irwin's account. The record shows that over about two years Shell made about $7,000 in purchases with this card. The government asserts that this evidence shows Irwin intended to further the conspiracy because she provided Shell with a charge card "through which he could spend his ill-gotten gains." Thus, the government argues, Irwin's providing Shell the charge card was like the defendant in *Griffin* who assisted the narcotics conspiracy by laundering the money earned by selling drugs. The comparison exaggerates the credit card's impact. Even if Shell's use of this card to make purchases was some assistance to the conspiracy, an inference we are uncertain is supported by the record, it was such trivial assistance that it cannot support the inference that Irwin intended by it to further the conspiracy's success. Importantly, Shell's use of the charge card did not hide his identity because the card was issued in his name. In fact his use of the card created a paper trail leading to him. These purchases took place over two years, so they averaged less than $300 per month, a trivial amount compared to the scope of this conspiracy. (Remember that Hoover estimated that One Day A Week alone netted him $200,000 to $300,000 per week.) Whatever assistance this might have been, $7,000 in two years is—standing alone—too insignificant to support the inference that with such aid Irwin intended to further the conspiracy's success. Although use of the card indicated a close relationship between Irwin and Shell, the natural consequence of Irwin letting Shell use the card is not that the conspiracy would be more likely to succeed, even if letting him use the card could be seen as an affirmative act of assistance.

### 2. *Irwin's renting a car for Shell.*

■ The government also contends that Irwin aided and abetted the conspiracy when she rented a car for Shell to use when visiting Hoover in prison. The thrust of the government's theory on appeal is that the rental car was essential because it disguised Shell's identity when he visited Hoover. As a prior convicted felon, Shell would not have been permitted to visit Hoover without obtaining a waiver from prison officials, so Shell used an alias. The government argues that by providing a rental car for Shell, Irwin assisted Shell to maintain his alias because if the prison officials were to check the license plate of the car it would come back as belonging to the rental agency and not Gregory Shell. Irwin does not dispute that she knew Shell was visiting Hoover and that he was using an alias to do so. The question is whether the aid of renting a car for Shell sufficiently supports the inference of intent to further the conspiracy. It falls short because of a gap in the government's evidence.

The initial difficulty with the government's theory is that it depends on there being something in the record supporting the inference that Shell's motive—at least in part—in using the rental car was to hide his identity from the prison officials, a proposition for which there is no support in the record. There is no direct evidence of Shell's motive in renting the car, nor is there circumstantial evidence to show a motive that supports the government's theory. The government presented evidence that the prison officials checked identification when someone came to visit Vienna, and that the prison guards would input the visitor's name into a computer. But the government did not offer any evidence regarding prison officials checking license plates. Nor did the government offer evidence that had the license plates been checked Shell's identity would not have been known, for he sometimes rented cars in his own name or was identified as an authorized driver, and only once used an alias in connection with renting a car. All this record shows is that on several occasions Irwin rent-

ed a car and listed Shell, once using an alias but usually not, as a driver. And on more than one occasion, she got a police discount from the rental company (15% in one case). This financial aid is insufficient to support the inference of intent to further the conspiracy. Without evidence of the license plate inspection, the slight savings on the cost of the rental car is inconsequential. Irwin's getting a discount for Shell was no real assistance. A 15% discount on a car rental was effectively meaningless to the success of a conspiracy this big. (He usually rented a high-cost car anyway.) Although it would be of some measurable aid to the organization, it could not reasonably be said to "materially" or "substantially" further its goals. And even if Shell had thought a rental car was essential to facilitate his visits to Hoover, by disguising his identity or otherwise, the government presented no evidence that it would have been more difficult for Shell to have gotten a rental car without Irwin, that Irwin's renting the car for him was also essential. Like the evidence of Shell's use of Irwin's credit card, *Irwin's* renting the car for Shell simply cannot, by itself, support the inference of intent. Because of Irwin's involvement with the restaurant (see below), we need not decide whether the credit card use and car rental could support that inference when combined with other evidence.

### 3. *Irwin's involvement with the restaurant.*

■■■ We now turn to the more substantial evidence of Irwin's aid to the conspiracy: her involvement with June's Shrimp on the Nine. Although the government describes the restaurant as a "nerve center" for the conspiracy, that characterization magnifies the facts. The restaurant was not the only place or even the main place where the conspirators met. The record showed that Shell held meetings at another restaurant in the neighborhood and he held meetings and collected payments at a place called the Criss Cross Lounge. Shell used the phone at June's Shrimp on the Nine to instruct co-conspirators to get their payments to him, but the record does not show that these payments were delivered to him at that restaurant. Even though the restaurant was not a so-

called "nerve center," it did play a significant role in the conspiracy. The government monitored thousands of gang-related calls coming in and going out. And members of the conspiracy, including some of its top leaders, were frequently at the restaurant. The critical question here, of course, is not whether *the restaurant* was some aid to the conspiracy, but whether Irwin's acts *vis a vis* the restaurant sufficiently support the inference of intent to benefit the conspiracy. They do.

Irwin furthered the conspiracy's goals in several ways. She acted as the nominal owner of the restaurant, which distanced the restaurant from Shell and the other members of the gang. While Irwin had a legitimate job that could explain how she got the money to purchase the restaurant, Shell was collecting public assistance and had testified in a paternity suit against him that he had no source of income, so his buying a restaurant for $13,500 would be suspicious. Moreover, Irwin did more than simply let Shell put her name on the papers: she conducted the transaction herself, signing the purchase contract and promissory note. And Irwin went further, using the services of an attorney to create a corporation which she maintained for two years by filing the appropriate forms with the state and paying the necessary fees. Irwin also worked in the restaurant to maintain the appearance at least that it was a legitimate business. And importantly, Irwin at least once asserted some control over the gang's activities in the restaurant in an effort to maintain that appearance of legitimacy. She called the restaurant and dictated that one of the gang, Garnett, should not be permitted to use the phone because he talked too much. She said, "And I don't want him talking to anybody about anything. *The only thing he's supposed to do is look out for you.*" Irwin said that she had told Shell about her decision. She explained, "Cuz see I have faith in you Marty, I don't have faith in in, in Garnett and them [others].... I don't know nothin' about them." This evidence permitted the inference that Irwin was assisting Shell in maintaining a clubhouse or meeting place for the gang and providing it a veneer of legitimacy. The natural conse-

quence of these acts is that the conspiracy would be more likely to succeed, so these acts at least sufficiently support the inference of intent. And so, because she concedes knowledge, her conviction was supported by sufficient evidence.

 Irwin raises another issue that need detain us only a moment. She was indicted for the substantive offense of conspiracy in violation of 21 U.S.C. § 846, and now she argues that her conviction is an impermissible variance from the indictment because she was not indicted as an aider and abettor. We have already rejected this argument, *Pearson*, 113 F.3d at 760–61 ("a defendant indicted for a substantive offense may be convicted as an aider and abettor"), and Irwin does not convince us that we must revisit our prior decision.

Finally, Irwin complains that she was unfairly convicted because she was a police officer and not based on the evidence. We agree that the government and its witnesses made frequent reference to her being a police officer, but she seems not to have objected to this evidence below nor on appeal does she claim error in its admission. We therefore have no occasion to determine whether its admission was correct.

Irwin's conviction is AFFIRMED.