# Liability of Contractors in Airbridge Denial Programs

A contractor ordinarily will not be criminally liable for assisting in certain foreign government programs for the aerial interdiction of illegal narcotics traffic.

March 1, 2004

MEMORANDUM OPINION FOR THE DEPUTY LEGAL ADVISER
DEPARTMENT OF STATE

You have asked for our opinion about the circumstances in which a contractor may be criminally liable for assisting in certain foreign government programs for the aerial interdiction of illegal narcotics traffic.[1] We believe that a contractor ordinarily will not be liable for providing such assistance.[2]

## I.

In 1994, we advised the Deputy Attorney General on the lawfulness of certain forms of United States Government ("USG") assistance to the Republics of Colombia and Peru. *United States Assistance to Countries That Shoot Down Civil Aircraft Involved in Drug Trafficking*, 18 Op. O.L.C. 148 (1994) ("1994 Opinion"). The 1994 Opinion concluded that the Aircraft Sabotage Act of 1984, which makes it a crime "willfully [to] destroy[] a civil aircraft registered in a country other than the United States while such aircraft is in service or cause[] damage to such an aircraft which renders that aircraft incapable of flight or which is likely to endanger that aircraft's safety in flight," 18 U.S.C. § 32(b)(2) (1994), generally applies to government actors, including the police and military personnel of foreign governments. 1994 Opinion, 18 Op. O.L.C. at 153–55.[3] Moreover, the criminal prohibition can apply even if no United States aircraft was involved and even if the act was not committed in this country. *Id.* at 152–53.

The 1994 Opinion advised that there was a "substantial risk that USG personnel who furnish assistance to the aerial interdiction programs of those countries could

---

[1] Letter for M. Edward Whelan III, Acting Assistant Attorney General, from Samuel Witten, Deputy Legal Adviser, Department of State (Aug. 4, 2003) ("State Department Letter").

[2] The Criminal Division concurs in this analysis.

[3] The Opinion concluded, however, that section 32(b)(2) implicitly recognizes certain defenses that are presumed to be available as to criminal prohibitions generally. 18 Op. O.L.C. at 163. In particular, section 32(b)(2) does not "criminaliz[e] actions by military personnel that are lawful under international law and the laws of armed conflict." *Id.* at 164. The Opinion noted that application of section 32(b)(2) to such cases "could readily lead to absurdities." *Id.* In addition, "even in cases in which the laws of armed conflict are inapplicable," section 32(b)(2) would not apply to actions taken by an officer who "reasonably believes that the aircraft poses a threat of serious physical harm" to the officer or another person where the threat is "direct and immediate" and "no reasonably safe alternative would dispel that threat." 1994 Opinion, 18 Op. O.L.C. at 164–65; *cf. United States v. Bailey*, 444 U.S. 394, 409–10 (1980).

be aiding and abetting criminal violations of the Aircraft Sabotage Act." *Id*. at 149 (citing 18 U.S.C. § 2(a)). The 1994 Opinion also cautioned that, absent certain preventive steps, "United States aid to Colombia and Peru might also implicate USG personnel in those governments' shootdown policies on a conspiracy rationale." *Id*. at 160–61 (citing 18 U.S.C. § 371 (1994)). To address these concerns, the 1994 Opinion recommended that the USG take certain steps. The risk that provision of aid to Colombia or Peru would fall within the criminal prohibition on aiding or abetting in 18 U.S.C. § 2(a) could be averted by obtaining a "reliable assurance . . . that the foreign government would carry out no shootdowns falling within the prohibition of § 32(b)(2)." *Id*. at 159. If the foreign government refused to give such an assurance, the USG would need to insist on a number of conditions designed to ensure that, in shooting down civil aircraft, the foreign government would use no assistance that had come from the USG. *Id*. at 160. Furthermore, the USG could "make [its] disapproval of shootdowns in violation of section 32(b) clear in order to eliminate any suggestion that USG personnel have entered into a conspiratorial agreement with foreign officials involving unlawful shootdowns," and "USG agencies should specifically instruct their personnel not to enter into any agreements or arrangements with the officials or agents of foreign governments that encourage or condone shootdowns." *Id*. at 161–62.

In October 1994, in response to the Executive Branch's articulation of the scope of section 32(b), as reflected in the 1994 Opinion, Congress enacted an express exception to any criminal culpability under federal law for certain law-enforcement shootdowns. National Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, § 1012, 108 Stat. 2663, 2837 (1994) (codified at 22 U.S.C. § 2291-4 (1994)). This exception, as later amended, provides that employees and agents of a foreign country engaged in interdictions, under specified circumstances, are not liable for shooting down civil aircraft:

> Notwithstanding any other provision of law, it shall not be unlawful for authorized employees or agents of a foreign country (including members of the armed forces of that country) to interdict or attempt to interdict an aircraft in that country's territory or airspace if—
>
> (1) that aircraft is reasonably suspected to be primarily engaged in illicit drug trafficking; and
>
> (2) the President of the United States has, during the 12-month period ending on the date of the interdiction, certified to Congress with respect to that country that—
>
> > (A) interdiction is necessary because of the extraordinary threat posed by illicit drug trafficking to the national security of that country; and

> (B) the country has appropriate procedures in place to protect against innocent loss of life in the air and on the ground in connection with interdiction, which shall at a minimum include effective means to identify and warn an aircraft before the use of force directed against the aircraft.

22 U.S.C. § 2291-4(a) (2000 & Supp. II 2003).[4] If the conditions specified as to foreign personnel are met, agents and employees of the United States are not liable for assisting the foreign personnel who shoot down the aircraft:

> Notwithstanding any other provision of law, it shall not be unlawful for authorized employees or agents of the United States (including members of the Armed Forces of the United States) to provide assistance for the interdiction actions of foreign countries authorized under subsection (a) of this section. The provision of such assistance shall not give rise to any civil action seeking money damages or any other form of relief against the United States or its employees or agents (including members of the Armed Forces of the United States).

*Id.* § 2291-4(b) (2000). Accordingly, when an aircraft is "reasonably suspected to be primarily engaged in illicit drug trafficking" and the President of the United States has determined prior to the interdiction that, with respect to a country, interdiction is "necessary because of the extraordinary threat posed by illicit drug trafficking to the national security of that country," and that the country "has appropriate procedures in place to protect against innocent loss of life," *id.* § 2291-4(a)(1)–(2), the employees and agents of the foreign government and the USG employees and agents who assist them are guilty of no crime as a result of interdicting the aircraft in that foreign country's territory or airspace.

In December 1994, the President made the requisite findings with regard to the Republics of Colombia and Peru, Presidential Determination No. 95-7, 3 C.F.R. 1046 (1995) (Colombia); Presidential Determination No. 95-9, 3 C.F.R. 1047 (1995) (Peru). However, after the Government of Peru in April 2001 accidentally shot down a plane carrying missionaries, the USG suspended its assistance to both countries. The program for Colombia has now been resumed, and programs for other countries could conceivably follow. You have asked us to examine the possible liability of contractors, engaged by the USG or the foreign government, who offer assistance in the conduct of an "airbridge denial program" meeting the standards of the exception in section 2291-4.

---

[4] The term "interdict" means "to damage, render inoperative, or destroy the aircraft." 22 U.S.C. § 2291-4(d)(1) (Supp. II 2003).

## II.

We begin with what should be the exceptional case: where the foreign government is conducting an airbridge denial program that the President has certified under 22 U.S.C. § 2291-4, but an employee or agent of the foreign government nonetheless shoots down a plane in violation of 18 U.S.C. § 32(b). For example, if a foreign government pilot willfully shoots down an aircraft that is not reasonably suspected of being primarily engaged in illegal drug trafficking, the question to be decided is whether a contractor who has given assistance for the interdiction (for example, by supplying and maintaining the radar used in the interdiction) could be liable as aiding and abetting the crime or conspiring to commit it. We start with the exceptional case because it allows us to set out the principles that govern the liability of accessories to crimes. With that background, we then will turn to the usual case, in which a civil aircraft is shot down but the interdiction is lawful because of the exception in 22 U.S.C. § 2291-4.

## A.

In 1909, Congress enacted a general aiding and abetting statute, which has since been amended and codified as 18 U.S.C. § 2(a) (2000) and now provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." Section 2(a) does not create an independent substantive offense, but instead provides that accessories are to be treated and punished as though they were principals. In other words, it eliminates the common-law distinction between principals in the first degree, principals in the second degree, and accessories before the fact. *See Standefer v. United States*, 447 U.S. 10, 19 (1980); *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177–78 (6th Cir. 1992).[5] As the Supreme Court has noted, section 2(a) declares that "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing the crime." *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181 (1994) (*citing Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). As this formulation suggests, and as the plain terms of section 2(a) require, an accessory is culpable under section 2(a) only if the government proves that the underlying offense was, in fact, committed (although the government need not prove the actual identity of the principal).[6]

---

[5] Under 18 U.S.C. § 3 (2000), accessories after the fact are guilty of a separate offense and suffer lesser punishment.

[6] *See, e.g.*, *United States v. Branch*, 91 F.3d 699, 732 (5th Cir. 1996); *United States v. Hill*, 55 F.3d 1197, 1204–05 (6th Cir. 1995); *Superior Growers*, 982 F.2d at 178; *United States v. Horton*, 921 F.2d 540, 543–44 (4th Cir. 1990); *United States v. Campa*, 679 F.2d 1006, 1013 (1st Cir. 1982).

The critical question for present purposes is the type of scienter that section 2(a) requires for accessory culpability. "In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *Nye & Nissen*, 336 U.S. at 619 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)); *see also* 1994 Opinion, 18 Op. O.L.C. at 156.[7] The accessory must provide the assistance with the specific intent of aiding the commission of the offense. Because, as we said in 1994, "[t]he contours of this element in the definition of aiding and abetting are not without ambiguity," *id.* at 157, and because the Department has addressed the issue of aider and abettor culpability in its *Report on the Availability of Bombmaking Information, the Extent to Which Its Dissemination is Controlled By Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent With the First Amendment to the United States Constitution, Submitted to the United States House of Representatives and the United States Senate* at 20–21 (April 29, 1997) ("Bombmaking Information Report"), *available at* http://cryptome.org/abi.htm (last visited June 6, 2013), we believe that further elaboration upon the discussion we offered in the 1994 Opinion is appropriate.

In its discussion of culpability under section 2(a) in connection with the provision of bombmaking information, the Department's Bombmaking Information Report explained:

> [T]he aider must not only know that her assistance will be in the service of a crime; she also must share in the criminal intent. The defendant must "'participate in [the venture] as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *Nye & Nissen*, 336 U.S. at 619 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). As Judge Hand explained in the seminal *Peoni* case, the intent standard for criminal aiding and abetting is not the same as the "natural consequences of one's act" test that is the touchstone for "intent" in the civil tort context; criminal intent to aid the crime has "nothing whatever to do with the probability that the forbidden result [will] follow upon the accessory's conduct." *Peoni*, 100 F.2d at 402. Rather, the aider must have a "purposive attitude" toward the commission of the offense. *Id.*

---

[7] The question of an accessory's scienter may be somewhat different where the underlying offense does not require purposive conduct, such as where the necessary state of mind for commission of the underlying offense is recklessness or negligence, or where the statute imposes strict liability. *See* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.7(e), at 149–52 (1986); *see generally* Audrey Rogers, *Accomplice Liability for Unintentional Crimes: Remaining Within the Constraints of Intent*, 31 Loy. L.A. L. Rev. 1351 (1998). Because section 32(b)(2) is not such an offense, we need not here consider such questions.

Bombmaking Information Report at 19 (footnote omitted). The report accordingly concluded that section 2(a) "generally would not prohibit or punish the dissemination of bombmaking information in the case where the disseminator does not have the specific purpose of facilitating a crime but nevertheless knows that a particular recipient thereof intends to use it for unlawful ends." *Id.* at 26. The following conclusions regarding the scienter element of aiding and abetting liability are consistent with the Bombmaking Information Report:

> (i) the scienter element requires that the aider actually "seek by his action to make [the crime] succeed," *id.* at 19;

> (ii) while the aider's knowledge (or suspicion) that aid will be (or is likely to be) used to commit crimes may be relevant to the evidentiary question of whether the actor purposively assisted the crime, such knowledge is not dispositive of the question of shared purpose, *id.*; and

> (iii) it should not, for purposes of section 2(a), automatically be presumed that an aider "intends" the "natural consequences" of his acts, *id.*

As the Department explained in the Bombmaking Information Report, before the Court's decision in *Nye & Nissen* there had been a growing debate in the lower courts on whether section 2(a) required purposive assistance, particularly in the case where a person knows, or strongly suspects, that aid he or she provides in the ordinary course of conduct or business will be used to commit a criminal offense.[8] It was the view of Judge Learned Hand that "purposive attitude" was essential, and that aiding and abetting under section 2(a) has "nothing whatsoever to do with the probability that the forbidden result would follow upon the accessory's conduct." *Peoni*, 100 F.2d at 402; *accord id.* (arguing that the "natural consequence of [one's] . . . act" principle, although germane to a civil case, is not the rule of criminal aiding and abetting culpability). As Judge Hand elaborated in *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205 (1940):

---

[8] As the Model Penal Code notes, "there are many and important cases" in this category, for example:

> A lessor rents with knowledge that the premises will be used to establish a bordello. A vendor sells with knowledge that the subject of the sale will be used in the commission of a crime. A doctor counsels against an abortion during the third trimester but, at the patient's insistence, refers her to a competent abortionist. A utility provides telephone or telegraph service, knowing it is used for bookmaking. An employee puts through a shipment in the course of his employment though he knows the shipment is illegal. A farm boy clears the ground for setting up a still, knowing that the venture is illicit.

Model Penal Code § 2.06 cmt. 6(c), at 316 (Official Draft & Revised Comments 1985).

> In [*Peoni*] we tried to trace down the doctrine as to abetting and conspiracy, as it exists in our criminal law, and concluded that the seller's knowledge was not alone enough. Civilly, a man's liability extends to any injuries which he should have apprehended to be likely to follow from his acts. If they do, he must excuse his conduct by showing that the interest which he was promoting outweighed the dangers which its protection imposed upon others; but in civil cases there has been a loss, and the only question is whether the law shall transfer it from the sufferer to another. There are indeed instances of criminal liability of the same kind, where the law imposes punishment merely because the accused did not forbear to do that from which the wrong was likely to follow; but in prosecutions for conspiracy or abetting, his attitude towards the forbidden undertaking must be more positive. It is not enough that he does not forego a normally lawful activity, of the fruits of which he knows that others will make an unlawful use; he must in some sense promote their venture himself, make it his own, have a stake in its outcome.

That view was challenged, most prominently by Judge John J. Parker in *Backun v. United States*, 112 F.2d 635 (4th Cir. 1940). In dicta in that case, Judge Parker wrote:

> Guilt as an accessory depends, not on "having a stake" in the outcome of crime. . . . The seller may not ignore the purpose for which the purchase is made if he is advised of that purpose, or wash his hands of the aid that he has given the perpetrator of a felony by the plea that he has merely made a sale of merchandise. One who sells a gun to another knowing that he is buying it to commit a murder, would hardly escape conviction as an accessory to the murder by showing that he received full price for the gun.

*Id.* at 637.

In *Nye & Nissen*, the Court, quoting *Peoni,* 100 F.2d at 402, held that "[i]n order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" 336 U.S. at 619 (emphasis added). More recently, in *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994), the Court reaffirmed *Nye & Nissen*. In *Central Bank*, the government argued that section 2(a) was pertinent authority for applying a "recklessness" standard for civil aiding and abetting liability under section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b) (1994). The Court rejected that argument, in part on the ground that the government's reliance on section 2(a) was "inconsistent" with its argument that a recklessness standard should govern:

> Criminal aiding and abetting liability under § 2(a) requires proof that the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *Nye & Nissen*, 336 U.S., at 619 (internal quotation marks omitted). But recklessness, not intentional wrongdoing, is the theory underlying the aiding and abetting allegations in the case before us.

511 U.S. at 190.[9]

With respect to culpability for aiding and abetting under section 2(a), then, the general question under the *Peoni* test is whether an individual "[sought] by his action to make [the crime] succeed," *Nye & Nissen*, 336 U.S. at 619 (internal quotation marks and citation omitted), *i.e.*, whether the individual "knowingly did some act for the purpose of [aiding] . . . the commission of that crime," and whether the defendant "acted with the intention of causing the crime charged to be committed." 1 Edward J. Devitt et al., *Federal Jury Practice & Instructions* § 18.01, at 693 (4th ed. 1992) (brackets in original).

A portion of our 1994 Opinion states a rule that appears to go beyond the scienter requirement of section 2(a) as analyzed above. The 1994 Opinion suggests that "USG agencies and personnel may not provide information (whether 'real-time' or other) or other USG assistance (including training and equipment) to Colombia or Peru in circumstances in which there is a reasonably foreseeable possibility that

---

[9] Moreover, the Court's use of the *Peoni* standard in *Nye & Nissen* has led the courts of appeals to adopt that standard. *See, e.g.*, *United States v. Teffera*, 985 F.2d 1082, 1086 (D.C. Cir. 1993); *United States v. de la Cruz-Paulino*, 61 F.3d 986, 998 (1st Cir. 1995); *United States v. Campa*, 679 F.2d 1006, 1010 (1st Cir. 1982); *United States v. Best*, 219 F.3d 192, 199–200 (2d Cir. 2000); *United States v. Jenkins*, 90 F.3d 814, 821 (3d Cir. 1996); *United States v. Bey*, 736 F.2d 891, 895 (3d Cir. 1984); *Rice v. Paladin Enters.*, 128 F.3d 233, 251 (4th Cir. 1997) (dictum) (quoting *Peoni*, 100 F.2d at 402, and characterizing *Nye & Nissen* as "adopting Judge Hand's view of the criminal intent requirement"); *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990); *United States v. Richeson*, 825 F.2d 17, 21 (4th Cir. 1987); *United States v. Branch*, 91 F.3d 699, 730 (5th Cir. 1996); *United States v. Jaramillo*, 42 F.3d 920, 923–24 (5th Cir. 1995); *Rattigan v. United States*, 151 F.3d 551, 557–58 (6th Cir. 1998); *United States v. Hill*, 55 F.3d 1197, 1201–02 (6th Cir. 1995); *United States v. Sewell*, 159 F.3d 275, 278 (7th Cir. 1998); *United States v. Simpson*, 979 F.2d 1282, 1288 (8th Cir. 1992); *United States v. Carranza,* 289 F.3d 634, 642 (9th Cir.), *cert. denied*, 537 U.S. 1037 (2002); *United States v. Vasquez-Chan*, 978 F.2d 546, 552 (9th Cir. 1992); *United States v. Sanchez-Mata*, 925 F.2d 1166, 1169 (9th Cir. 1991); *United States v. McMahon*, 562 F.2d 1192, 1195 (10th Cir. 1977); *United States v. Howard*, 13 F.3d 1500, 1502 (11th Cir. 1994); *cf.* Model Penal Code § 2.06(3)(a)(ii) & cmt. 6(c), at 296, 313–19 (recommending the adoption of the equivalent of the *Peoni* standard in criminal codes). Some panel decisions of the Seventh Circuit analyze the scienter requirement of section 2(a) in a manner that could be construed to be in tension with one or more aspects of the *Nye & Nissen*/*Peoni* rationale, *see United States v. Fountain*, 768 F.2d 790, 797–98 (7th Cir. 1985); *United States v. Zafiro*, 945 F.2d 881, 887–88 (7th Cir. 1991), *aff'd on other grounds*, 506 U.S. 534 (1993); *United States v. Ortega*, 44 F.3d 505, 508 (7th Cir. 1995); *see also United States v. Irwin*, 149 F.3d 565, 569–76 (7th Cir. 1998); but an en banc decision of the Seventh Circuit indicates that the *Peoni* rule is the governing law in that circuit as well. *See United States v. Piño-Perez*, 870 F.2d 1230, 1235 (7th Cir. 1989) (en banc) ("We and other courts have endorsed Judge Learned Hand's definition of aiding and abetting . . . .").

such information or assistance will be used in shooting down civil aircraft, including aircraft suspected of drug trafficking." 18 Op. O.L.C. at 162. As far as section 2(a) is concerned, however, a person could be culpable as an aider and abettor only if he provided aid to a foreign nation with the purpose of helping an unlawful shootdown succeed.[10]

Applying the test for aiding and abetting liability, we turn to the question whether a contractor could be liable when the government it has assisted engages in an unlawful shootdown. Under the applicable test, a contractor would aid and abet a violation of section 32(b)(2) only if he sought by his aid to make the unlawful interdiction succeed.[11]

There is no definitive test for determining when circumstantial evidence would warrant an inference of the requisite scienter. The nature of the assistance and its relation to the underlying crime, as well as the gravity of the crime, may be pertinent in determining whether the aider sought to make the unlawful shootdown succeed. For example, if the crime is particularly grave, the assistance is essential (in the sense that without it the crime could not be committed and the principal could not readily obtain the assistance from another source), and the particular type of assistance cannot easily be (and is not typically) put to lawful use, it may be reasonable to infer that the facilitator harbored the necessary intent to satisfy

---

[10] It is unclear whether the language in the 1994 Opinion regarding any "reasonably foreseeable possibility" of the unlawful use of the aid could be understood in light of the particular factual background presented there and the concomitant risk that the relevant facts might have been susceptible to an inference of purposive facilitation. *See* 18 Op. O.L.C. at 162. In particular, the 1994 Opinion observed that certain "USG personnel [had] been fully engaged in the air interdiction operations of each country, providing substantial assistance that . . . contributed in an essential, direct and immediate way" to the ability of the countries at issue "to shoot down civil aircraft." *Id.* at 158. Under certain factual scenarios, a finder of fact might have been warranted in finding the requisite scienter for purposes of section 2(a). Moreover, we concluded in the 1994 Opinion that in the shootdown context, because the issue is an individual's intent, aiding and abetting culpability could not definitively be negated simply by virtue of an official announcement that the USG was opposed to any violations of section 32(b)(2), and, in particular, that the USG was opposed to the use of USG aid in unlawful shootdowns. *Id.* at 157–58. To be sure, such clear statements, combined with unambiguous instructions to USG personnel never to provide aid for the purpose of facilitating unlawful shootdowns, would have helped to minimize the likelihood of a judicial finding of impermissibly motivated facilitation where aid provided by USG personnel did, in fact, assist a foreign nation in an unlawful shootdown. *Cf. id.* at 161–62 (advice concerning mitigation of risk of prosecution for unlawful conspiracy). But in particular cases, circumstantial evidence might still have permitted an inference that particular USG personnel, contrary to announced government policy, had provided aid for the purpose of facilitating unlawful shootdowns. Occasionally, "aid rendered with guilty knowledge [that it will be used unlawfully] implies purpose since it has no other motivation." Model Penal Code § 2.06 cmt. 6(c), at 316. We need not try to resolve such issues here.

[11] We should stress, however, that this test does not depend upon the accessory's ultimate motive. If the person sought by his actions to increase the likelihood that an unlawful shootdown succeed, it does not matter why he wished to facilitate the shootdown—for instance, because of a desire to retain amicable relations with the foreign country.

the *Peoni* standard.[12] *See Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) ("While [intent to further the unlawful scheme] is not identical with mere knowledge that another purposes unlawful action, it is not unrelated to such knowledge.").

Particularly as to lawful uses of assistance, there is a critical difference between the circumstances of the 1994 Opinion and the circumstances in which a contractor would act now. Now, under specified conditions, the foreign government can lawfully interdict civil aircraft reasonably suspected of being primarily engaged in illegal drug trafficking, whereas in 1994 it could not do so. The circumstances, therefore, do not naturally suggest the possibility that those providing assistance for the airbridge denial program share the purpose of conducting illegal interdictions. On the contrary, the more natural inference, absent particular facts indicating otherwise, is that the contractor intends the assistance to be used in accordance with the rules of the program that the President has certified under 22 U.S.C. § 2291-4. Given such an intent, the contractor would not be guilty of aiding and abetting under 18 U.S.C. § 2(a).

## B.

The general conspiracy statute, 18 U.S.C. § 371 (2000), provides a criminal penalty "[i]f two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy." As the Supreme Court has explained, "agreement remains the essential element of the crime [of conspiracy under 18 U.S.C. § 371], and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact." *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975). In the 1994 Opinion, we considered whether a court "might . . . construe ongoing USG assistance [used to shoot down civil aircraft] as evidence of an agreement" that would amount to a conspiracy. 18 Op. O.L.C. at 161. We recommended that the USG "make [its] disapproval of shootdowns in

---

[12] See, e.g., *Hill*, 55 F.3d at 1201, discussing who could be culpable under section 2(a) for aiding and abetting an unlawful gambling business:

> [I]t is quite obvious that bettors should not be held criminally liable either under the [substantive] statute or under § 2 and that local merchants who sell the accounting paper or the computers on which bets are registered are not sufficiently connected to the enterprise to be included even if they know that their goods will be used in connection with the work of the business. On the other hand, it seems similarly obvious that the seller of computer hardware or software who is fully knowledgeable about the nature and scope of the gambling business would be liable under § 2 if he installs the computer, electronic equipment and cables necessary to operate a "wire shop" or a pari-mutuel betting parlor, configures the software programs to process betting information and instructs the owners of the gambling business on how to use the equipment to make the illegal business more profitable and efficient. Such actions would probably be sufficient proof that the seller intended to further the criminal enterprise.

violation of § 32(b) clear in order to eliminate any suggestion that USG personnel have entered into a conspiratorial agreement with foreign officials." *Id.* at 161–62. We also recommended that "USG agencies should specifically instruct their personnel not to enter into any agreements or arrangements with the officials or agents of foreign governments that encourage or condone shootdowns." *Id.* at 162 (citation omitted).

Once again, the significant difference between the present circumstances and those in 1994 is that, under 22 U.S.C. § 2291-4, a foreign government may maintain a lawful program in which certain civil aircraft are shot down. A contractor who supplies assistance for interdictions, but does not agree to the use of the assistance for unlawful shootdowns, is not guilty of conspiracy. Ordinarily, moreover, if a contractor is providing assistance for a lawful program, and a pilot or other participant in the foreign government's chain of command in that program commits an act that leads to an illegal shootdown, there will be no reason for a finder of fact to infer that the contractor had agreed to assist in that unlawful act. The reasonable inference, absent facts to the contrary, would be that the contractor, far from agreeing to an illegal use of its assistance, intended that the assistance would be used in accordance with the program that has been certified.[13]

### III.

We now turn to, and can briefly dispose of, what should be the more usual case, in which a contractor's assistance is used for lawful interdictions.

Section 2291-4 declares that, when the conditions of a Presidential determination and reasonable suspicion of drug trafficking have been met, "it shall not be unlawful for authorized employees or agents of a foreign country . . . to interdict or attempt to interdict an aircraft in that country's territory or airspace," and "it shall not be unlawful for authorized employees or agents of the United States . . . to provide assistance for the interdiction actions." 22 U.S.C. § 2291-4(a), (b). When these provisions apply, they rule out a contractor's liability for aiding and abetting. The statute on aiding and abetting provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). As the Supreme Court has explained, and as we noted above, section 2(a) declares that "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Central Bank*, 511 U.S. at 181 (citing *Nye & Nissen*, 336 U.S. at 619). An accessory thus may be culpable under section 2(a) only if the government proves that the underlying offense was, in fact, committed. *See, e.g.*, *United States v. Branch*, 91 F.3d 699, 732 (5th Cir. 1996); *United States v. Hill*, 55 F.3d 1197, 1204–05 (6th Cir. 1995);

---

[13] We do not address any possible application of 18 U.S.C. § 2339A, which deals with the provision of material support in connection with a variety of offenses, including 18 U.S.C. § 32.

*Superior Growers*, 982 F.2d at 178; *United States v. Horton*, 921 F.2d 540, 543–44 (4th Cir. 1990); *United States v. Campa*, 679 F.2d 1006, 1013 (1st Cir. 1982). Here, however, under section 2291-4, the action that the contractor has assisted "shall not be unlawful," and there is no underlying offense that the contractor could aid and abet.[14]

Nor would the lawful interdiction of a civil aircraft create any liability for a contractor under 18 U.S.C. § 371. Because there would be no agreement "to commit any offense against the United States," the contractor could not be guilty of an unlawful conspiracy under 18 U.S.C. § 371.

M. EDWARD WHELAN III
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[14] In some circumstances, a contractor might be an "agent" of the United States or the foreign government and thus covered directly by the language in 22 U.S.C. § 2291-4 declaring that the specified actions by "authorized employees or agents" are not unlawful. In view of our discussion in the text, we need not resolve the question of the circumstances under which a contractor would be an "agent."